**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ x
ERIC M. BERMAN, P.C., LACY KATZEN, LLP,   :
DBA ASSET HOLDINGS CORP.,             :
                                                 :
                       Plaintiffs,     :
                                                 :
           -against-            :         **MEMORANDUM & ORDER**
                                               :
CITY OF NEW YORK, NEW YORK CITY       :        09-CV-3017 (ENV) (CLP)
COUNSEL, NEW YORK CITY DEPARTMENT OF :
CONSUMER AFFAIRS, JONATHAN MINTZ, in  :
his official capacity as the Commissioner of the New  :
York City Department of Consumer Affairs,   :
                                             :
                      Defendants.    :
------------------------------------------------------------------x

**VITALIANO, D.J.**

      New York City has been involved in regulating debt collection since at least 1984, when

it began requiring debt collection agencies to obtain a municipal license in order to practice in

the city. In March 2009, New York City Council passed Local Law 15, which, *inter alia*,

amended the debt collection ordinance to cover debt buyers and attorneys engaging in debt

collection activities. Plaintiffs contend that these amendments are contrary to New York state

law, violate the Commerce and Contract Clauses of the United States Constitution, and render

the debt collection ordinance unconstitutionally vague. Both plaintiffs and defendants have now

moved for summary judgment. For the reasons set forth below, plaintiffs' motion is GRANTED

in part and DENIED in part, as is defendants'.

## I. BACKGROUND

### A. Legislative History

      In 1984, New York City Council passed Local Law 65, which required debt collection

agencies to obtain a license in order to practice in the city. In the prefatory legislative

declaration, City Council stated that, "[w]hile the majority of those engaged in [the debt collection] business are honest and ethical in their dealings, there is a minority of unscrupulous collection agencies in operation that practice abusive tactics such as threatening delinquent debtors, or calling such people at outrageous times of the night."  N.Y. City Admin. Code § 20-488 (1984).  In the Council's view, "[t]hese actions constitute tactics which would shock the conscience of ordinary people."  *Id.*  For this reason, Local Law 65 made it "unlawful for any person to act as a debt collection agency without first having obtained a license."  *Id.* § 20-490.  "Debt collection agency" was defined as "a person engaged in business the principal purpose of which is to regularly collect or attempt to collect debts owed or due or asserted to be owed or due to another," but specifically excluded "any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client."  *Id.* § 20-489.  Agencies covered under this definition had to apply for a two-year license, at an application or renewal fee of $75, or else face penalties for failure to adhere to the licensing requirements.  *Id.* §§ 20-491, 20-492, 20-494.

In December 2007, the Council introduced Int. 660, a bill to amend the debt collection ordinance.  As originally proposed, the bill made two changes to the ordinance.  First, it amended the definition of debt collection agency to include "a buyer of debt who refers such debt to another for collection or to an attorney-at-law for litigation in order to collect such debt."  (Decl. of Nicholas Ciapetta in Support of Cross Motion for Summary Judgment ("Ciapetta Decl."), Ex. D.)  Second, the exclusion for attorneys was clarified to cover "any attorney-at-law or law firm collecting a debt in such capacity on behalf of and in the name of a client . . . through legal activities such as the filing and prosecution of lawsuits to reduce debts to judgments," but not "any attorney-at-law or law firm who regularly engages in activities traditionally associated with debt collection, including but not limited to, sending demand letters or making collection

telephone calls." (*Id.*) In other words, under the proposed bill, "buyers of debt"—organizations that purchase debt from originating or other creditors and outsource debt collection to third-parties, including law firms—and attorneys or law firms regularly engaging in non-litigation debt collection activities would be required to apply for a debt collection license.

In hearings on the bill in February 2009 before the City Council's Committee on Consumer Affairs, witnesses discussed the growth in the debt-buying industry, a shift particularly evident in the explosion of debt collection-related lawsuits brought by these organizations. Relying largely on a 2007 study by the Urban Justice Center ("UJC"), City Councilmembers, the Director of Legislative Affairs for the New York Department of Consumer Affairs, and representatives of various advocacy groups testified that approximately 90% of the more than 300,000 consumer credit collection actions being filed in Civil Court annually were brought by debt collection organizations that did not originate the debt at issue. (*See, e.g.*, *id.*, Ex. E, at 13 (oral testimony of Andrew Eiler, Director of Legislative Affairs for the Department of Consumer Affairs).) The same witnesses expressed concern that these organizations have different incentives than originating creditors. In the words of the Director of Legislative Affairs, for example, "[w]hen the debt has been sold for the purpose of collecting it, the person buying it doesn't care about any ongoing relationship. The only thing he cares about is collecting the money." (*Id.* at 43-44.) Thus, while "[t]he originating creditor might have reasons for dampening the extent to which he pursues the claims that he may have," a debt buyer "does not have these inhibitions." (*Id.* at 44.)

In addition to expressing continued concerns regarding the harassing practices that had motivated Local Law 65, many of the witnesses testified to the use of aggressive tactics by debt

buyers and their lawyers in collection actions against vulnerable consumers.[1]  For example, of the consumer credit cases brought by debt buyers in 2006, the UJC found that 99% were submitted using invalid evidence.  (*Id.*, Ex. G, pt. 2, at 6-7 (written testimony of Harvey Epstein, Project Director of UJC Community Development Project); *see also id.* Ex. E, at 113 (oral testimony of Claudia Wilner, Senior Staff Attorney, Neighborhood Economic Development Advocacy Project ("NEDAP")) (estimating that in cases brought by debt buyers in which NEDAP was involved, 40% were completely devoid of merit).)  Thus, according to several legal services organizations that testified before the committee, in cases in which these organizations represented debtors against debt buyers, they rarely lost.  (*See, e.g.*, *id.*, Ex. G, pt. 1, at 2 (written testimony of Legal Aid Society) ("In several years of representing clients against debt buyers in the Civil Court, we have never lost a case against a debt buyer—why?  Because when put to the test, most debt buyers cannot prove their case."); *id.* Ex. G, pt. 3, at 19 (written testimony of Claudia Wilner on behalf of NEDAP) ("If challenged, debt buyers are often unable to come up with any admissible evidence that the defendant owes any money at all."); *id.* at 2 (written testimony of Carolyn E. Coffey, Staff Attorney, Consumer Rights Project, MFY Legal Services) ("[O]ver the past three years, not one consumer credit case handled by the Consumer Rights Project . . . has gone to trial, chiefly because the debt buyer could not prove its case . . . or could not prove that it actually owned the debt in question.").)  In the vast majority of cases, however, debtors were not represented or failed to appear, often because of inadequate notice.  (*See id.*, Ex. E, at 113 (Wilner oral testimony) (finding that in cases brought by debt buyers in which NEDAP was involved, 79% of debtors were not properly served with a summons and a

---

[1] Plaintiffs dispute that any of the statements made during the February hearings as to any purported abusive practices on the part of debt collectors was true, that any abusive practices took place, and that any consumers contacted by debt collectors in NYC were, in fact, vulnerable.

complaint).)  Indeed, of the cases sampled in its study, the UJC found that over 80% resulted in default judgments, allowing debt buyers to garnish the wages and freeze the bank accounts of defaulting debtors. (*See id.*, Ex. G, pt. 2, at 7 (Epstein written testimony).)

Over the strenuous objections of representatives from the debt collection industry that Int. 660 would violate the federal Constitution and New York state law, witnesses testified that the proposed amendments were necessary to address these problems and bring previously unlicensed debt buyers and their agents under the licensing aegis of the City.  In the words of one witness, debt buyers that contracted collection activities to third parties were "among the worst perpetrators of abusive collection practices against city residents."  (*See id.*, Ex. E, at 107 (oral testimony of Janet Ray Kalson, Chair of the Civil Court Committee of New York Bar Association).)  However, because many debt buyers outsourced actual collection to other organizations and employed law firms to pursue legal action, they arguably were not covered by Local Law 65's definition of "debt collection agency."  (*See id.* at 5 (introductory remarks of Leroy Comrie, Chair of Committee on Consumer Affairs) ("[D]ebt buyers claim that since they outsource the collection duties to other parties . . . they [are] exempt from the licensing requirements.").)  Int. 660 accordingly was drafted to require these organizations, as well as law firms regularly engaging in debt collection activities, to obtain a license from the Department of Consumer Affairs.  (*See id.* at 8 (oral testimony of Councilmember Dan Garodnick).).  Obtaining a license would also subject them to the Department's investigatory and sanctioning authority. (*See id.* at 30 (Eiler oral testimony) ("The most important thing is that the department, with respect to licensees, has hearing authority and the commissioner has the authority to award restitution for damages that a consumer suffers as a result of violations of the law."); *see also id.*, Ex. G, pt. 1, at 20 (written testimony of Robert Martin, Associate Director, District Council 37,

Municipal Employees Legal Services) ("[T]he biggest single rationale for this amendment is to enable DCA to perform investigations of debt buyers and to bring cases against those who violate the law."); *id.*, pt. 3, at 24 (Kalson written testimony) ("While these issues can be raised in individual cases, litigants, almost all of whom are unrepresented, and overworked judges should not be the only enforcers of the law.").)

Following the February 2009 hearings, Int. 660 was amended as Int. 660-A. In March 2009, the Committee on Consumer Affairs published a report on the amended bill that echoed much of the testimony from consumer activists at the February hearings and extensively cited the UJC study.[2] (*See id.*, Ex. H.) The report noted that one-third of the bottom 20% of income-earners in New York City were saddled with high credit-card debts. (*Id.* at 2.) These debts increasingly were owned by debt buyers, not debt originators, who often relied on legal action to facilitate their collection efforts. (*Id.* at 4 ("While debt collection practices used to include such outreach to the debtor as phone calls and postal letters . . . the new crop of debt buyers have opted instead to go directly to the New York City Civil Court.").) The Report also pointed to debt buyers' aggressive legal tactics and the large number of default judgments being obtained against debtors. (*See id.* at 5 (citing UJC finding that, of 600 sampled cases, 99 percent involved invalid evidence); *see also id.* at 4 ("Approximately 93.3 percent of defendants in consumer debt cases do not appear in court. Failure to appear in court, often the result of inadequate notice of the lawsuit, invariably results in a default judgment in favor of the plaintiff, which then allows the debt collector to acquire payment through such means as garnished wages or frozen bank accounts.").)

In addition, the Report noted that fewer than one-third of debt buyers bringing claims

---

[2] Plaintiffs dispute that the statements in the report are true or accurate "in any way" and that the UJC Study "in any way" provided an unbiased, true, or accurate representation of the state of debt collection in New York City.

against New York City debtors were licensed by the Department of Consumer Affairs. According to the Report, "[m]any debt buyers have claimed that they are immune to licensing requirements of the DCA since they outsource the actual collection duties to other parties, such as debt collection law firms."[3] (*Id.* at 4.)  Thus, "[b]y clarifying the definition of debt collection agency," Int. 660 "seeks to address the debt buyers' argument . . . that once they contract collection of the debt to another party they are engaged in 'passive' collection and as such are not required to be licensed as debt collection agencies by DCA." (*Id.* at 8.)  For the same reason, the bill would require licenses for "those attorneys and/or law firms who engage in collection activities traditionally performed by debt collectors, such as contacting debtors through the mail or via telephone." (*Id.*)  Finally, the bill included additional regulatory requirements addressing debt collectors' communications with debtors.  (*Id.* at 8-9.)

**B.  Local Law 15 and Associated Regulations**

Following further amendments and hearings, on March 11, 2009, the Committee on Consumer Affairs approved what would become Local Law 15 by a vote of 4-0.  The same day, the City Council voted unanimously to pass the law, which was signed on March 18, 2009 by Mayor Michael R. Bloomberg and became effective on July 16, 2009.

As enacted, Local Law 15 did not alter § 20-490, which requires debt collection agencies to obtain a Department of Consumer Affairs ("DCA") license and comply with "all other applicable laws, rules and regulations"; § 20-491, which provides that licenses for debt collection

---

[3] In *Kuhne v. Cohen & Slamowitz, LLP*, 579 F.3d 189 (2d Cir. 2009), the Second Circuit certified to the New York Court of Appeals the question of whether a company that "engages in the business of purchasing defaulted consumer debt and authorizes third party debt collection agencies to engage in debt collection activities to collect that debt, including the filing of lawsuits in [its] name in the event that their initial efforts are unsuccessful" constituted a "debt collection agency" under the pre-amendment version of § 20-489(a).  On September 22, 2009, the Court of Appeals accepted certification, *Kuhne v. Cohen & Slamowitz, LLP*, 13 N.Y.3d 791, 887 N.Y.S.2d 539, 916 N.E.2d 434 (2009); however, for reasons not evident in the public record, the Second Circuit withdrew certification on March 4, 2010, *see Kuhne v. Cohen & Slamowitz*, LLP, 14 N.Y.3d 786, 899 N.Y.S.2d 118, 925 N.E.2d 920 (2010) (acknowledging withdrawal of certification).

agencies are valid for two years and require an annual fee of $75; or § 20-492, which provides, *inter alia*, that applicants for a license must file a DCA application.  The law did amend § 20-489, which defines which entities are considered debt collection agencies.  As amended, § 20-489 reads as follows, with the new language underlined and omitted language bracketed:

> § 20-489: "Debt collection agency" shall mean a person engaged in business the principal purpose of which is to regularly collect or attempt to collect debts owed or due or asserted to be owed or due to another <u>and shall also include a buyer of delinquent debt who seeks to collect such debt either directly or through the services of another by, including but not limited to, initiating or using legal processes or other means to collect or attempt to collect such debt</u>.  The term does not include . . .

> (5) any attorney-at-law <u>or law firm</u> collecting a debt [as an attorney] <u>in such capacity</u> on behalf of and in the name of a client <u>solely through activities that may only be performed by a licensed attorney, but not any attorney-at-law or law firm or part thereof who regularly engages in activities traditionally performed by debt collectors, including, but not limited to, contacting a debtor through the mail or via telephone with the purpose of collecting a debt or other activities as determined by rule of the commissioner</u> . . . .

N.Y. City Admin. Code § 20-489 (2009).  It is to these amendments to the definition of "debt collection agency," bringing within its scope debt buyers and attorneys regularly engaging in activities traditionally performed by debt collectors, which plaintiffs' suit is primarily addressed.

Local Law 15 also added two new sections, §§ 20-493.1 and 20-493.2, setting out required and prohibited collection practices.  The new § 20-493.1 mandates—in addition to any practices required under any federal, state or local law—that a debt collection agency (a) provide, in any permitted communication with the consumer, (i) a call-back number to a phone that is answered by a natural person, (ii) the name of the agency, (iii) the originating creditor of the debt, (iv) the name of the person to call back, and (v) the amount of the debt at the time of the communication, as well as (b) confirm with the consumer, in writing within five business days, any debt payment schedule or settlement agreement reached regarding the debt.  *Id.* § 20-493.1.

8

The new § 20-493.2 forbids—beyond any practices prohibited under any federal, state, or other local law—a debt collection agency from (a) attempting to collect or contact a consumer regarding a debt after the consumer requests verification of the debt, until the debt collection agency furnishes written documentation identifying the creditor who originated the debt and itemizing the principal balance of the debt and all other charges that remain or are alleged to remain due, or (b) contacting a consumer about, or seeking to collect, a debt on which the statute of limitations for initiating legal action has expired, unless the debt collection agency first provides the consumer such information about the consumer's legal rights as the DCA prescribes. *Id.* § 20-493.2.

Finally, Local Law 15 also amended § 20-494, creating additional penalties for violations. As amended, § 20-494 reads as follows:

> Any person who, after notice and hearing shall be found guilty of violating any provision of this subchapter, shall be punished in accordance with the provisions of chapter one of this title and shall be subject to a penalty of not less than seven hundred dollars nor more than one thousand dollars for each violation <u>provided further, however, that any such person found guilty of having acted as a debt collection agency in violation of section 20-490 of this subchapter shall be subject to an additional penalty of one hundred dollars for each instance in which contact is made with a consumer in violation of such section.</u>

*Id.* § 20-494 (new language underlined).

On April 24, 2010, the DCA promulgated regulations pursuant to Local Law 15. The regulations both amplify the requirement under § 20-493.1(a) that debt collectors communicating with debtors provide a call-back number to a phone answered by a natural person and clarify the documentation debt collection agencies are required to provide to debtors to comply with §§ 20-493.1(b), 20-493.2(a), and 20-493.2(b). *See* Rules of the City of New York, tit. 6, ch. 2 §§ 2-190, 2-191, 2-192, 2-194. The regulations also set out detailed record requirements for debt collection agencies to maintain for each debt that the agency attempts to collect and for each

debtor the agency seeks to collect from, as well as record requirements relating to the agency's operations and practices. *See id.* § 2-193.

## C. Procedural History

On July 15, 2009, plaintiffs filed this lawsuit against the City of New York, New York City Council, the DCA, and Jonathan Mintz, in his official capacity as DCA Commissioner. Plaintiff Eric Berman P.C. ("Berman P.C."), a New York professional service corporation with its principal place of business in New York, is a law firm engaged in the business of seeking to recover amounts due and owing on consumer debt portfolios held by debt buyers.[4] Plaintiff Lacy Katzen, LLP ("Katzen LLP"), a New York limited liability partnership with its principal place of business in New York, is also a law firm engaged in the business of consumer debt recovery on the behalf of debt buyers.[5] Plaintiff DBA Asset Holdings Corp. ("DBA"), a Delaware Corporation with its principal place of business in Delaware, is a buyer of consumer debt. It does not contact debtors directly, either in New York City or elsewhere, but instead enters into contracts with debt collectors and law firms, which attempt to recover amounts due on DBA's debt portfolio on DBA's behalf.

In their complaint, plaintiffs assert several challenges to New York City's debt collection

---

[4] On November 15, 2010, plaintiffs' counsel notified the Court that plaintiff Eric M. Berman had passed away. Following this notification, on January 10, 2011, plaintiffs advised the Court that they did not intend to move for substitution of Mr. Berman's estate in this lawsuit as Mr. Berman's successor in interest, and requested that the Court dismiss their claims insofar as they were asserted by the late Mr. Berman. Defendants have not contested this request. The Court agrees with plaintiffs that every cause of action asserted by Mr. Berman also has been asserted by one of more of remaining plaintiffs, and so plaintiffs' suit, as well as their motion for summary judgment, may proceed. *See* Fed. R. Civ. P. 25 ("After a party's death, if the right sought to be enforced survives only to or against the remaining parties, the action does not abate, but proceeds in favor of or against the remaining parties."). Insofar as plaintiffs' claims were asserted by Mr. Berman, they are dismissed voluntarily. *See* Fed. R. Civ. P. 41(a)(2) (allowing for dismissal of claims by court order upon a plaintiff's request).

[5] It is undisputed that Katzen LLP "regularly seeks to recover amounts due and owing on consumer debt portfolios" held by debt buyers. (Defs.' Statement of Undisputed Material Facts Pursuant to Local Civ. R. 56.1 ¶ 50; Pls.' Resp. to Defs.' Statement Pursuant to Local Civ. R. 56.1 ¶ 50; Decl. of Mark H. Stein ¶ 2.)

regulations.  First, plaintiffs claim that these regulations are preempted under New York State law, both because New York State has demonstrated its intent to preempt the entire field of debt collection regulation—thereby assumedly rendering invalid all of New York City's debt collection regulations—and because Local Law 15 is inconsistent with §§ 600, 601, and 602 of the New York General Business Law and §§ 53 and 90 of the New York Judiciary Law.  Second, plaintiffs claim that the amendments violate the Commerce Clause of the United States Constitution because they have the practical effect of regulating commerce that is wholly extraterritorial to New York State and, in the alternative, because the burdens imposed by these amendments on interstate commerce clearly outweigh their putative local benefits.  Third, plaintiffs claim that the amendments violate the Contract Clause of the United States Constitution, insofar as they substantially impair the contractual obligations between debt buyers and originating creditors, debt buyers and debtors, and debt buyers and third-party debt collectors and law firms that attempt to recover on debt portfolios owned by the debt buyers. Finally, plaintiffs claim that the amendments violate the Due Process Clause of the United States Constitution, since the statutory phrases "solely through activities that may only be performed by a licensed attorney," "regularly engages in activities traditionally performed by debt collectors," and "other means to collect or attempt to collect such debt," that have been added to § 20-489 are unconstitutionally vague.  Accordingly, plaintiffs seek declaratory and injunctive relief as to the application to them of New York City's debt collection regulations, as well as costs and attorneys' fees.[6]

---

[6] In setting out the standard for summary judgment, plaintiffs' memorandum of law quotes *Uryevick v. Rozzi*, 751 F. Supp. 1064, 1067 (E.D.N.Y. 1990), for the proposition that "a claim that a statute is facially unconstitutional generally raises only questions of law, and hence is an appropriate subject for a summary judgment motion." However, aside from plaintiffs' void-for-vagueness challenge to Local Law 15—which plaintiffs maintain is unconstitutional on its face and as applied to them—it is evident that plaintiffs' constitutional claims regard the application of Local Law 15 only to themselves, and the Court construes them as such.  To the extent that plaintiffs

Now before the Court are the parties' cross-motions for summary judgment. The Court will address each of the claims presented in turn.

## II. DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment is granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court's responsibility in assessing the merits of a summary judgment motion is thus not to try issues of fact, but rather to "determine whether there are issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995). Accordingly, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, *see, e.g., Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005), and the Court must resolve all ambiguities in the evidence and draw all permissible factual inferences in favor of the party opposing the motion, *see, e.g., Sec. Ins. Co. of Hartford v. Old Dominion Freight Line. Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."). Where, as here, cross motions for summary judgment are filed, we "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under

---

also intend to attack Local Law 15 on its face under the Commerce or Contract Clauses, this challenge fails, since plaintiffs have failed to demonstrate—indeed, have failed to argue—that the statute has no conceivable constitutional application under these Clauses. *See Bach v. Pataki*, 408 F.3d 75, 89 (2005) ("'A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist[s] under which the Act would be valid.'") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

consideration." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010).

**B.  State Law Preemption Claims**

In New York, as in other states, the lawmaking authority of a municipal corporation such as New York City, which is a political subdivision of the state, can be exercised only to the extent it has been delegated by the state.   *See Albany Area Builders Ass'n v. Town of Guilderland*, 74 N.Y.2d 372, 376, 547 N.Y.S.2d 627, 546 N.E.2d 920 (N.Y. 1989).   The New York State Constitution "confers broad police power upon local government relating to the welfare of its citizens."  *N.Y. State Club Ass'n v. City of N.Y.*, 69 N.Y.2d 211, 217, 513 N.Y.S.2d 349, 505 N.E.2d 915 (N.Y. 1987).   Under Article IX of the New York Constitution, every local government has the power, among others, "to adopt and amend local laws" relating to "its property, affairs or government" and "the protection, order, conduct, safety, health and well-being of persons or property" within its jurisdiction, so long as "not inconsistent with the provisions of the constitution or not inconsistent with any general law [enacted by the state of New York]."  N.Y. Const. art IX, § 2(c); *accord* N.Y. Mun. Home Rule Law § 10(1).  As Article IX indicates, however, there are important limitations on the police powers of local government. *See N.Y. State Club Ass'n*, 69 N.Y.2d at 217.  For instance, a local government "may not exercise its police power when the Legislature has restricted such an exercise by preempting the area of regulation."  *Id.*   Moreover, even if the State has not preempted the entire area or field of regulation, a "local government . . . may not exercise its police power by adopting a local law inconsistent with constitutional or general law."  *Id.*  These limitations "reflect the untrammeled primacy of the Legislature to act with respect to matters of State concern."  *Albany Area Builders Ass'n*, 74 N.Y.2d at 377 (internal quotation marks omitted).

Plaintiffs argue that Local Law 15 violates both of these limitations on New York City's

police powers.   In their view, New York State has created a comprehensive regulatory framework governing debt collection practices, thereby evincing the Legislature's intent to preempt the entire field of debt collection regulation.   In the alternative, plaintiffs argue that Local Law 15 directly conflicts with New York General Business Law §§ 600, 601, and 602, as well as with New York Judiciary Law §§ 53 and 90.   While the Court finds that plaintiffs' field preemption and conflict preemption claims as to New York General Business Law §§ 600, 601 and 602 are without merit, it agrees with plaintiffs that Local Law 15's amendments relating to attorneys are in direct conflict with New York Judiciary Law §§ 53 and 90.

      **1.**   ***Field Preemption***

Debt collection practices are regulated at both the federal and state levels.   The Fair Debt Collection Practices Act ("the FDCPA") explicitly permits state regulation.   *See* 15 U.S.C. § 1692n ("This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter . . . ."); *see also* 28 U.S.C. § 3003(d) (noting that prescribed federal procedures for debt collection preempt state laws only to the extent that such laws are inconsistent with federal procedures).   While the FDCPA is silent as to whether local regulation of debt collection is also permitted, the Supreme Court has held that substantively identical statutory language under other federal regulatory statutes does not preempt local regulation.   *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605-08 (1991) (holding that statute allowing states to "regulate the sale or use of any federally registered pesticide or device . . . if and to the extent the regulation does not permit any sale or use" prohibited by the federal statute did not preempt local regulation, since "[m]ere silence . . . cannot suffice to establish a 'clear and manifest

purpose' to pre-empt local authority") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *accord City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 429, 432-33 (2002).  In light of the requirement that Congress evince a "clear and manifest purpose" to preempt local regulation, *Mortier*, 501 U.S. at 605, the FDCPA should be construed to permit New York City's debt collection regulations.

Plaintiffs argue, however, that New York State has created a comprehensive regulatory framework governing debt collection practices, thereby rendering Local Law 15—and, assumedly, New York City's entire regulatory regime governing debt collection—invalid. Under New York law, preemption of an entire regulatory field need not be express.  Rather, "[t]he Legislature's intent to so preempt a particular area can be inferred from a declaration of policy or from a comprehensive or detailed scheme in a given area."  *Incorporated Village of Nyack v. Daytop Village, Inc.*, 78 N.Y.2d 500, 505, 577 N.Y.S.2d 215, 583 N.E.2d 928 (N.Y. 1991) (citing *N.Y. State Club Ass'n*, 69 N.Y.2d at 217; *Consolidated Edison Co. v. Town of Red Hook*, 60 N.Y.2d 99, 105, 468 N.Y.S.2d 596, 456 N.E.2d 487 (N.Y. 1983)).  If the state has preempted the entire field of regulation, any local law regulating the same subject matter will be deemed inconsistent with state law and will not be given effect.  *See id.* (citing *Jancyn Mfg. Corp. v. County of Suffolk*, 71 N.Y.2d 91, 97, 524 N.Y.S.2d 8, 518 N.E.2d 903 (N.Y. 1987); *People v. Cook*, 34 N.Y.2d 100, 109, 356 N.Y.S.2d 259, 312 N.E.2d 452 (N.Y. 1974)).  "This finding of preemption is justified by the belief that '[s]uch laws, were they permitted to operate in a field preempted by State law, would tend to inhibit the operation of the State's general law and thereby thwart the operation of the State's overriding policy concerns.'"  *Id.* (quoting *Jancyn Mfg. Corp.*, 71 N.Y.2d at 97).

Plaintiffs do not point to an express statement of preemption or a declaration of

legislative policy to occupy the entire field of debt collection.   Rather, they argue that New York

State's intent to occupy the field can be inferred from what they claim to be the state's

comprehensive regulatory scheme governing debt collection practices, as set out in New York

General Business Law §§ 600, 601, and 602.   Under these provisions, "principal creditors"—

defined as "any person, firm, corporation or organization to whom a consumer claim is owed,

due or asserted to be due or owed, or any assignee for value of said person, firm, corporation or

organization," N.Y. Gen. Bus. Law § 600—and their agents are prohibited from undertaking a

narrow enumerated set of practices, including (1) simulating a law enforcement officer or

representative of a New York governmental agency; (2) knowingly collecting, attempting to

collect, or asserting any right to a collection fee, attorney's fee, court cost or expense not justly

due or legally chargeable against the debtor; (3) disclosing or threatening to disclose false

information "affecting the debtor's reputation for credit worthiness"; (4) communicating or

threatening to communicate the nature of a consumer claim to the debtor's employer prior to

obtaining a final judgment against the debtor; (5) disclosing or threatening to disclose

information concerning the existence of a debt known to be disputed by the debtor without

disclosing that fact; (6) communicating with the debtor or any member of the debtor's family or

household in an abusive or harassing manner; (7) threatening any action which the principal

creditor does not normally take in the usual course of business; (8) claiming a right, or

attempting or threatening to enforce a right, if the right does not exist; (9) using a communication

that falsely simulates legal or judicial process or otherwise gives the appearance of being

authorized, issued or approved by the government or an attorney; and (10) failing to keep

complete records concerning all information subpoenas sent by the creditor if it sends more than

fifty such subpoenas per month, *see id.* § 601.   Any violation of these provisions is a

16

misdemeanor, and the New York Attorney General or the District Attorney of any county has the authority to bring an injunctive action to restrain or prevent such practices.  *See id.* § 602.

Contrary to plaintiffs' contention, these limited restrictions fall far short of situations in which the New York courts have found preemptory intent.  *See, e.g.*, *Albany Area Builders Ass'n*, 74 N.Y.2d at 377-80 (finding state had enacted comprehensive regulatory scheme in the field of highway funding); *Consolidated Edison Co.*, 60 N.Y.2d at 105-08 (holding state had preempted local regulation regarding the siting of major steam electric-generating plants); *People v. De Jesus*, 54 N.Y.2d 465, 468, 446 N.Y.S.2d 207, 430 N.E.2d 1260 (N.Y. 1981) (holding that New York Alcoholic Beverage Control Law preempted local law).  The mere fact that New York State has chosen to impose some restrictions on debt collection activities does not in itself require a finding of preemptory intent.  *See Jancyn Mfg. Corp.*, 71 N.Y.2d at 99 ("[T]hat the State and local laws touch upon the same area is insufficient to support a determination that the State has preempted the entire field of regulation . . . .").  Nor does the fact that the New York City ordinance, *see* N.Y. City Admin. Code §§ 20-493.1, 20-493.2, goes beyond New York State law in imposing additional limitations on debt collection practices.  *See Incorporated Village of Nyack*, 78 N.Y.2d at 508 ("[T]he test is not whether the local law prohibits conduct which is permitted by State law, because that test is much too broad . . . ."); *accord N.Y. State Club Ass'n*, 69 N.Y.2d at 221.  Thus, the Court finds that the dictates of New York General Business Law §§ 600, 601, and 602 do not evince any attempt by New York State to preempt the field of debt collection.

**2.   _Conflict Preemption with New York General Business Law §§ 600, 601 and 602_**

In the alternative, plaintiffs argue that Local Law 15's new requirements for debt collection practices, N.Y. City Admin. Code §§ 20-493.1, 20-493.2, are directly inconsistent

with those set out in New York General Business Law §§ 600, 601, and 602.  The Court again disagrees.

In New York, as noted earlier, a local government "may not exercise its police power by adopting a local law inconsistent with constitutional or general law."  *N.Y. State Club Ass'n*, 69 N.Y.2d  at 217; *see also* N.Y. Const. art IX, § 2(c); N.Y. Mun. Home Rule Law § 10(1).  Since the state has not preempted the entire field of regulation, there must be a direct inconsistency between state and local law for the latter to be held invalid; a mere showing that the local law prohibits conduct that would be permitted under state law is insufficient.  *See N.Y. State Club Ass'n*, 69 N.Y.2d at 221 ("'If this were the rule, the power of local governments to regulate would be illusory.'") (quoting *Cook*, 34 N.Y.2d at 109); *accord Jancyn Mfg. Corp.*, 71 N.Y.2d at 96-99.  Plaintiffs have not pointed to any such direct inconsistency between the dictates of §§ 20-493.1 and 20-493.2 and those imposed by New York law.  Nor could they.  The new provisions in Local Law 15 add only two required practices—namely, giving consumers (i) a call-back number, as well as information about the debt sought to be collected, and (ii) confirmation of any debt payment schedule or settlement agreement reached—and two prohibited ones—namely, attempting to collect on a debt or contacting a consumer (i) after the consumer requests verification of the debt or (ii) if the statute of limitations for initiating legal action has expired, unless the debt collection agency first provides the consumer required information about his legal rights.  *See* N.Y. City Admin. Code §§ 20-493.1, 20-493.2.  These provisions supplement the limited list of prohibited practices set out under New York General Business Law §§ 600, 601, and 602, but in no way directly conflict with them.  Nor is there any direct conflict between the New York statutory provisions and the DCA regulations amplifying § 20-493.1(a)'s disclosure requirements, *see* Rules of the City of New York, tit. 6, ch. 2 §§ 2-190, 2-191, 2-192,

2-194, as promulgated pursuant to the DCA Commissioner's authority to issue rules and regulations necessary to carry out the powers and duties of the department, *see* N.Y. City Charter § 2203(e).[7]  In the absence of any such conflict, the Court rejects plaintiffs' conflict preemption claim insofar as it relates to New York General Business Law §§ 600, 601 and 602.

### 3.  *Conflict Preemption with New York Judiciary Law §§ 53 and 90*

The Court agrees with plaintiffs, however, that Local Law 15 is in direct conflict with New York Judiciary Law §§ 53 and 90.  As such, it exceeds the City of New York's authority, and must be found invalid to the extent that it purports to regulate attorney conduct.

The admission of attorneys to the New York bar, as well as their supervision and regulation, is vested with the judiciary.  Section 53 of the New York Judiciary Law provides, in relevant part, that the New York Court of Appeals "may from time to time adopt, amend, or rescind rules . . . regulating the admission of attorneys and counselors at law, to practice in all the courts of record of the state," including making provisions "it shall deem proper for admission to practice," and "prescrib[ing] rules providing for a uniform system of examination."  N.Y. Jud. L. § 53(1)-(2).  Most importantly for purposes of this action, § 90 provides, in relevant part:

> The supreme court shall have power and control over attorneys and counselors-at-law and all persons practicing or assuming to practice law, and the appellate division of the supreme court in each department is authorized to censure, suspend from practice or remove from office any attorney and counselor-at-law admitted to practice who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice; and the appellate division of the supreme court is hereby authorized to revoke such admission for any misrepresentation or suppression of any information in connection with the application for admission to practice.

*Id.* § 90(2).

---

[7] Plaintiffs do not allege that the additional restrictions on debt collection practices set out in Title 6, Chapter 5 of the Rules of the City of New York, *see* tit. 6, ch. 5 §§ 5-76, 5-77, 5-78, are in direct conflict with state law, and so the Court has no occasion to address them.

As the New York courts have recognized, the language of § 90 establishing that "[t]he supreme court shall have power and control over attorneys and counselors-at-law and all persons practicing or assuming to practice law," *id.*, "broadly establishes judicial governance over the conduct of attorneys." *In re Wong*, 275 A.D.2d 1, 5, 710 N.Y.S.2d 57 (1st Dep't 2000); *accord In re Roth*, 487 N.Y.S.2d 710, 712 (Sup. Ct. 1985) (noting that "the boundaries of permissible practice for attorneys is a matter for the State Legislature and the Supreme Court"), *aff'd sub nom*, *Roth v. Turoff*, 124 A.D.2d 471, 507 N.Y.S.2d 822 (1st Dep't 1986).  Pursuant to this statutory provision, attorneys are officers of the court, and "their professional conduct is subject to the supervisory and corrective powers" of the state judiciary.  *In re Zuckerman*, 20 N.Y.2d 430, 439, 231 N.E.2d 718 (N.Y. 1967).  Consequently, the regulation of attorneys' conduct is not within the police power of municipalities.  *See* N.Y. Mun. Home Rule Law § 11 (stating that municipalities "shall not be deemed authorized . . . to adopt a local law which supersedes a state statute, if such local law . . . [a]pplies to or affects the courts as required or provided by article six of the constitution"); *cf. Roth*, 487 N.Y.S.2d at 712 ("[N]o local legislature has the power to define new limitations on the practice of the law.").

In purporting to regulate attorneys and law firms that "regularly engage[] in activities traditionally performed by debt collectors," N.Y. City Admin. Code § 20-489 (2009), Local Law 15 is in direct conflict with the New York Judiciary Law.  Under Local Law 15, no attorney or law firm may regularly represent creditors seeking to recover on consumer debts without first obtaining a DCA license and, having obtained a license, complying with DCA licensing requirements.  But it is simply not within the DCA's power to license attorneys or regulate their professional conduct.  *See* N.Y. Mun. Home Rule Law § 11; *see also* N.Y. City Charter § 2203(c) (granting DCA commissioner control over "the granting, issuing, transferring,

20

renewing, revoking, suspending and cancelling of all licenses and permits, *except in the cases with respect to which and to the extent to which any of said powers are conferred on other persons or agency by laws*") (emphasis added).  Rather, when an attorney contacts a debtor on behalf of a client, she acts as an officer of the court, and is subject to the supervision and control of the New York judiciary.  With respect to attorneys authorized by state law to practice in the courts of New York, the DCA can have no role as gatekeeper.[8]

Seeking to avoid this conclusion, defendants argue that attorneys who regularly seek to collect on debts on behalf of creditors are attorneys in name only: in reality, they claim, these attorneys are acting as debt collectors, and may be regulated as such.  In defendants' view, only when there is "an inherently legal component" to an attorney's activities, or the activities are "inexorably intertwined" with the practice of law, is the supervision of these activities left to the courts.  No such limitation on judicial authority, however, is contemplated under New York law.  To the contrary, the New York courts can and have set out standards regulating the provision of nonlegal services by attorneys.  Indeed, when attorneys are providing nonlegal services to clients, they may be held to the same professional standards as when providing legal services.  *See* N.Y. State Unified Court System, Rules of Professional Conduct, Rule 5.7(a)(1) (stating that a lawyer or law firm that "provides nonlegal services to a person that are not distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the provision of both legal and nonlegal services"); *id.* Rule 5.7(a)(2) (stating that a lawyer providing nonlegal services that are distinct from legal services being provided "is subject to these Rules with respect to the nonlegal services if the person receiving the services

---

[8] Federal regulation of attorneys is not so precluded.  *See Heintz v. Jenkins*, 514 U.S. 291, 299 (holding the FDCPA "applies to attorneys who regularly engage in consumer debt collection activity, even when that activity consists of litigation"); *see also infra* pp. 25-26.

could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship").  Not only do the courts possess the authority to regulate the nonlegal activities of attorneys once they are admitted to the bar, they may discipline attorneys for nonlegal activities conducted prior to their admission to the bar.  *See Wong*, 710 N.Y.S.2d at 60 (noting the courts' "inherent authority to discipline attorneys for misconduct").    Charitably put, defendants' cramped view of the scope of the judiciary's authority over attorney conduct is inaccurate.[9]

Even were defendants correct that only those activities that have "an inherently legal component" or are "inexorably intertwined" with the practice of law are within the exclusive regulatory purview of the judiciary, it is far from clear that the activities covered by Local Law 15 would fall outside defendants' proposed parameters.  For instance, as the code provision indicates, "activities traditionally performed by debt collectors" include "contacting a debtor through the mail or via telephone with the purpose of collecting a debt."  N.Y. City Admin. Code § 20-489(5).  In the course of contacting debtors, debt collectors may threaten or instigate legal proceedings, *cf.* N.Y. City Admin. Code § 20-489 (listing "initiating or using legal processes" as one method debt collectors may use to collect on a debt), or attempt to negotiate settlement agreements or payment schedules for the outstanding debt, *cf.* Rules of the City of New York, tit. 6, ch. 2 § 2-192 (setting out regulations for debt payment schedules and settlement agreements).  Yet these tasks—seeking to vindicate a client's legal rights by contacting counter-parties, negotiating the fulfillment of clients' contracts, and threatening or initiating legal action—are tasks routinely performed by attorneys.  When an individual licensed to practice law performs

---

[9] Similarly, New York City is not free to regulate attorneys' activities simply because they may also be performed by non-attorneys.  Consequently, Local Law 15's exception for those attorneys or law firms "collecting on a debt in such capacity on behalf of and in the name of a client solely through activities that may only be performed by a licensed attorney," N.Y. City Admin. Code § 20-489(5), does not remedy New York's intrusion into the preserve of the judiciary.

these actions, it is impossible to say, as defendants would have it, that she is acting simply as a debt collector, and not as an attorney.

In support of their argument, defendants analogize debt collection to driving a taxi cab: in their view, since collecting on a debt, just like driving a taxi cab, has no connection to the practice of law, New York City may require an attorney to obtain a debt collection license, just as it obviously may require the attorney to obtain a municipal taxi driver's license. Supreme Court's decision in *Roth* helps illustrate why this analogy is incorrect. In *Roth*, Supreme Court addressed whether New York City Council could require an attorney to obtain a license to act, not as a taxi driver, but as a taxi broker. In concluding that this requirement "impermissibly interfere[d] with an attorney's right to practice law," 487 N.Y.S.2d at 712, Supreme Court noted that the tasks a taxi broker performs are indistinguishable from those customarily performed by an attorney:

> The law defines a "taxicab broker" as one "who, for another . . . acts as an agent or intermediary in negotiating the purchase or sale of a taxicab " (Administrative Code § 2325 [a]). Taking this definition at face value it is clear that no attorney could possibly represent either the buyer or seller of a taxicab without first obtaining a license from the Commission and complying with the requirements of such licensing. Is it not a commonplace function of an attorney -- in the sale and purchase of any property -- real or personal -- to participate in negotiations of all aspects of the prospective transaction including price, terms, security and a myriad of other issues between the parties? How could an attorney, not licensed by the Commission, but requested by a client to prepare a bill of sale and a security agreement in connection with the sale of a taxicab, do so without subjecting himself or herself to both civil and criminal penalties? It would appear that he or she could not.

*Id.*

The same is true of the tasks performed by debt collectors. Under Local Law 15, no attorney may regularly represent creditors seeking to collect debts without first obtaining a DCA license and complying with its requirements. These requirements, however, include limitations

23

on activities that are commonplace functions of attorneys, such as communicating with adverse parties and seeking to vindicate clients' contractual rights.  *See* N.Y. City Admin. Code §§ 20-493.1, 20-493.2 (setting out required and prohibited debt collection practices); Rules of the City of New York, tit. 6, ch. 2 §§ 2-190, 2-191, 2-192, 2-194 (same).  Without a DCA license, an attorney may not undertake these functions, creating an "impermissibl[e] interfere[nce] with an attorney's right to practice law."  *Roth*, 487 N.Y.S.2d at 712.

Therefore, while the Court agrees with defendants that there may well be some activities, like driving a taxi cab or operating a fruit stand, that are so unrelated to the practice of law that they may be regulated by municipalities, even if performed by an attorney, there can be no material factual dispute that the activities Local Law 15 seeks to regulate lie far from this line. For similar reasons, Local Law 15 is also very far from the incidental regulations of attorney conduct that have been upheld by the New York courts.  *See, e.g.*, *Forti v. N.Y. State Ethics Comm'n*, 75 N.Y.2d 596, 615, 555 N.Y.S.2d 235 (1990) (upholding "revolving door" provisions of state law restricting professional activities of former governmental employees that had "merely incidental" effect on the practice of law); *People v. Law Offices of Andrew F. Capoccia L.L.C.*, 289 A.D.2d 650, 651, 733 N.Y.S.2d 550 (3d Dep't 2001) (holding that delegation of attorney regulation to judiciary did not prevent Attorney General's prosecution of law for engaging in fraudulent business practices); *Aponte v. Raychuk*, 531 N.Y.S.2d 689, 692 (Sup. Ct. 1988) (upholding application of New York City's regulations restricting deceptive advertising to attorneys), *aff'd* 160 A.D.2d 636, 559 N.Y.S.2d 255 (1st Dep't 1990).[10]  Unlike the regulations

---

[10] In this regard, the authority of New York State to regulate attorney conduct is considerably greater than that of the City.  *See Forti*, 75 N.Y.2d at 615 (noting that, since "the very power of this court to prescribe rules for the admission of attorneys is derived from the Legislature," it "can—and does—regulate many aspects of the practice of law in this State").  Nonetheless, the New York legislature routinely exempts attorneys from otherwise generally-applicable state licensing requirements. *See, e.g.*, N.Y. Real Prop. Law § 442-f (exempting attorneys from licensing requirements for real estate brokers and salesmen enumerated in New York Real Property Law §§ 440-a to 442-e);

upheld in these decisions, Local Law 15 would directly regulate core aspects of the practice of law.  Defendants' reliance on these decisions, therefore, is unavailing.

Finally, defendants note that several of the debt collection activities restricted by Local Law 15—in particular, contacting a consumer about a debt on which the statute of limitations has run, or seeking to collect such a debt unless the debt collector first provides the consumer with certain information regarding his legal rights, *see* N.Y. City Admin. Code § 20-493.2(b); Rules of the City of New York, tit. 6, ch. 2 § 2-191—are also prohibited by federal law.  *See* 15 U.S.C. § 1692(e) (prohibiting debt collectors from threatening to take any action that cannot legally be taken); *id.* § 1692(f)(1) (prohibiting the collection of any debt unless permitted by law); *cf.* N.Y. Gen. Bus. Law § 601 (prohibiting attempts to enforce legal rights if such rights do not exist). They argue, correspondingly, that plaintiffs' strident warning that Local Law 15 would require attorneys to violate their ethical duties to clients—by forcing an attorney seeking to collect a time-barred debt to inform the debtor of the running of the statute of limitations, an affirmative defense to litigation—is misplaced.  But this argument misses the point.  Unlike the New York City Council, the federal government is not obligated to draft its statutes so as to comport with New York law.  *Cf.* U.S. Const. Art. VI, cl. 2 (establishing the supremacy of federal law). Rather, the federal government may—and does—regulate the conduct of attorneys acting as debt collectors.  *See Heintz v. Jenkins*, 514 U.S. 291, 299 (1995) (holding that FDCPA applies to attorneys who regularly engage in consumer debt collection activities).  New York City Council,

---

N.Y. Tax Law § 32(a)(14) (exempting attorneys and employees of attorneys from registration requirements for tax return preparers detailed in New York Tax Law § 32(b)-(g)); N.Y. Ins. Law § 2101(f)(1), (g)(1)(H), (g)(2)(B) (exempting attorneys from licensing requirements for reinsurance-intermediaries, independent adjusters, and public adjusters specified in New York Insurance Law §§ 2102-04, 2123, 2127, 2132); N.Y. Gen. Bus. Law § 83 (exempting attorneys and representatives employed exclusively by attorneys from licensing requirements for private investigators, bail enforcement agents, and watch, guard or patrol agencies set forth in New York General Business Law § 70).  This solicitude for the authority of the courts over attorney conduct is in sharp contrast to Local Law 15's encroachment on the judiciary's regulatory domain.

by contrast, may only regulate within the limits set out under New York law.  *See* N.Y. Const. art IX, § 2(c); N.Y. Mun. Home Rule Law § 10(1).  In attempting to regulate attorney conduct, it has exceeded this authority, and the ordinance, along with its accompanying regulations, to that extent are without force and effect.

## C.  Dormant Commerce Clause Challenge

Plaintiffs next argue that, by requiring out-of-state debt buyers that do not directly engage in any in-state collection activities to obtain a DCA license or else be subject to penalties, the amendments to § 20-489 and § 20-494 violate the Commerce Clause of the United States Constitution.  For the same reason, plaintiffs argue that § 20-493.1 and § 20-493.2, which require out-of-state debt buyers to undertake certain required collection practices and forego certain prohibited practices or else be subject to monetary penalties, also violate the Commerce Clause. Defendants contest these claims.  For the reasons discussed below, the Court denies summary judgment to both plaintiffs and defendants on the Commerce Clause claims.

Article I, Section 8, Clause 3 of the United States Constitution empowers Congress to "regulate commerce . . . among the several States."  Although the Clause is phrased as an affirmative grant of congressional power, it is well-established that the Clause also contains a negative or "dormant" aspect that denies to the States "the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 98 (1994).  This dormant aspect reflects "the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy v. The Beer Inst.*, 491 U.S. 324, 335, 336 (1989).  In its jurisprudence addressing the "dormant" Commerce Clause, the Supreme Court has indicated that at least three

types of legislation may implicate these concerns: legislation that discriminates between in-state and out-of-state commercial actors, either on its face or in its intent or effect; statutes that regulate "wholly extraterritorial" commerce—a category whose ostensibly clear boundaries are, in fact, extremely difficult to demarcate, as discussed in greater detail below; and statutes that—although they neither discriminate nor regulate wholly extraterritorial commerce—nonetheless unduly burden interstate commerce.

Here, plaintiffs do not contend that Local Law 15 discriminates against out-of-state commercial actors, only that it unconstitutionally regulates wholly extraterritorial commerce and unduly burdens interstate commerce. When analyzing claims that legislation falls afoul of the dormant Commerce Clause in either of these manners, courts in this Circuit have adopted different approaches. Some decisions subject laws that regulate wholly extraterritorial commerce, as well those that discriminate against interstate commerce, to a higher level of scrutiny than those that unduly burden interstate commerce. For instance, in *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004), the Second Circuit set out a tripartite test for evaluating statutes and ordinances under the dormant Commerce Clause. *See also Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (following analysis set out in *Freedom Holdings*); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 168 (2d Cir. 2005) (same). First, "a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid *per se*," and may survive "only if the discrimination is 'demonstrably justified by a valid factor unrelated to economic protectionism.'" *Freedom Holdings*, 357 F.3d at 216 (quoting, *inter alia*, *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992)) (additional internal quotations and citation omitted).[11] Similarly, a statute "will be invalid *per se*

---

[11] Other decisions have stated that a discriminatory statute may survive dormant Commerce Clause scrutiny only if it

if it has the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question." *Id.* (citing *Healy*, 491 U.S. at 336). If a statute does not discriminate against interstate commerce nor regulate wholly extraterritorial commerce, "it will nevertheless be invalidated under the '*Pike* balancing test' if it imposes a burden on interstate commerce incommensurate with the local benefits secured." *Id.* (citing, *inter alia*, *Pike v. Bruce Church*, *Inc.*, 397 U.S. 137, 142 (1970)) (internal quotations and additional citation omitted).

In subjecting to heightened scrutiny statutes that discriminate against interstate commerce or regulate wholly extraterritorial commerce, these cases follow the Supreme Court's decisions in *Healy* and *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986). *See Brown-Forman*, 476 U.S. at 579 ("When a state statute directly regulates or discriminates against interstate commerce . . . we have generally struck down the statute without further inquiry."); *accord Healy*, 491 U.S. at 336 (explaining that the Commerce Clause prohibits the adoption of legislation that directly controls, or is applied to, "commerce that takes place wholly outside of the State's borders"); *see also* 1 Laurence H. Tribe, American Constitutional Law § 6-8, at 1074 (3d ed. 2000) ("[T]he Court has articulated virtually a *per se* rule of invalidity for extraterritorial state regulations . . . .").[12] Nonetheless, other cases in this Circuit have analyzed legislation that is claimed to regulate extraterritorially under the more

---

"'advance[s] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives,'" *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 188 (2d Cir. 2009) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988)), while at least one Supreme Court decision has suggested that such statutes are "generally struck down . . . without further inquiry," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).

[12] Reading *Brown Forman*'s proscription against the "direct regulation" of "interstate" commerce in context, it is clear that the Court had in its sights the regulation of extraterritorial conduct. *See Brown Forman*, 476 U.S. at 579-84 (examining whether the challenged statute "regulates commerce in other States"); *see also Healy*, 491 U.S. at 332 (explaining that *Brown Forman* "reaffirm[ed] and elaborat[ed] on our established view that a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause"); 1 Tribe § 6-8, at 1074 (equating "extraterritorial state regulations" with "laws which directly regulate out-of-state commerce").

permissive *Pike* balancing test, which requires only that the burden on interstate commerce not clearly outweigh the local benefits of the statute.  *See, e.g. Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 50 (2d Cir. 2005) (noting that legislation regulating commercial activity "wholly beyond the state's borders" may incidentally burden interstate commerce and consequently will be analyzed under *Pike* framework); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 108-10 (2d Cir. 2001) (analyzing claim that challenged legislation regulating wholly extraterritorial commerce under *Pike* framework).[13]

Other Courts of Appeals have encountered similar confusion, *see, e.g.*, *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644-46 (6th Cir. 2010) (addressing this question), no doubt due, at least in part, to the fact "that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach," *Brown-Forman*, 476 U.S. at 579.  Still, the vast majority of circuits have followed the *Healy / Brown-Forman* analysis.  *See, e.g.*, *Boggs*, 622 F.3d at 646; *Midwest Title Loans, Inc. v. Mills.*, 593 F.3d 660, 665-66 (7th Cir. 2010); *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1307 (10th Cir. 2008); *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489-92 (4th Cir. 2007); *Philip Morris, Inc. v. Reilly*, 267 F.3d 45, 62-

---

[13] In *Town of Southold*, the Circuit also noted that imposing "a regulatory requirement inconsistent with those of other states" constitutes another circumstance in which a statute may incidentally burden interstate commerce.  477 F.3d at 50.  While *Town of Southold* and some other decisions treat the problem of inconsistent regulations under the dormant Commerce Clause as distinct from that posed by extraterritorial regulations, the two issues are inextricably related.  *Cf.* Donald H. Regan, *Siamese Essays: (1)* CTS Corp v. Dynamics Corp. of America *and Dormant Commerce Clause Doctrine; Extraterritorial State Legislation*, 85 Mich. L. Rev. 1865, 1875 ("The connection between inconsistent regulations and extraterritoriality is simple and direct: if every legally regulable event or state-of-affairs could be unambiguously assigned to a unique territorial jurisdiction, then a prohibition on extraterritorial legislation would make inconsistent regulations . . . impossible."); *accord* Katherine Florey, *State Courts, State Territory, State Power: Reflections on the Extraterritoriality Principle in Choice of Law and Legislation*, 84 Notre Dame L. Rev. 1057, 1089 (2009) (noting that "the problem of inconsistent regulations is inextricably linked with that of extraterritoriality").  For this reason, the risk of inconsistent regulations is normally considered as part of the extraterritoriality analysis.  *See Healy*, 491 U.S. at 336 (noting that one consideration under the extraterritoriality analysis is "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation").

63 (1st Cir. 2001); *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 784-88 (3d Cir. 1999); *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995).  *But see Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1014-15 (9th Cir. 1994) (stating that impact on extraterritorial commerce is one consideration under *Pike*).

The near-universal consensus among other circuits aside, in light of the different approaches followed in this circuit, it is not immediately evident which framework to use in analyzing plaintiffs' claim that Local Law 15 unconstitutionally regulates extraterritorial commerce.  Still, in at least two decisions, the Second Circuit has indicated that either approach may be appropriate.  *Freedom Holdings*, 357 F.3d at 216 n.11; *accord Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 64 n.18 (2d Cir. 2010) ("[A] court may analyze a claim that a state statute is invalid because it regulates commerce extraterritorially either as a disproportionate burden on commerce under the [*Pike*] balancing test . . . or . . . independently . . . .").  Indeed, the choice of analytical framework is not dispositive here: as discussed in greater detail below, under either framework, both parties' motions for summary judgment must be denied.  For the sake of thoroughness, the Court will first address plaintiffs' extraterritoriality claim independently of the *Pike* analysis, and then will proceed to consider the extraterritoriality claim under *Pike*, along with plaintiffs' other balancing arguments.

1. *Extraterritoriality*

The prohibition on state and local laws regulating extraterritorial commerce has been developed in a line of Supreme Court cases stretching back to the 1930's.  *See Healy*, 491 U.S. 324; *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987); *Brown Forman*, 476 U.S. 573; *Edgar v. MITE Corp.*, 457 U.S. 624 (1982) (plurality opinion); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935).  In *Healy*, the Court crystallized the principles embodied by these decisions

as follows:

> Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, the 'Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State,' *Edgar*, 457 U.S. at 642-43 (plurality opinion); *see also Brown-Forman*, 476 U.S. at 581-583, and, specifically, a State may not adopt legislation that has the practical effect of establishing 'a scale of prices for use in other states,' *Seelig*, 294 U.S. at 528. Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. *Brown-Forman*, 476 U.S. at 579. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State. *Cf. CTS Corp.*, 481 U.S. at 88-89. And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another. *Brown-Forman*, 476 U.S. at 582.

*Healy*, 491 U.S. at 336-37 (format of internal citations modified). Or, to put the central principle even more succinctly, a state may not enact legislation that has the practical effect of regulating commerce that takes place wholly outside of its borders, whether or not the commerce has effects within the state, and whether or not the statute's extraterritorial scope was intended by the lawmakers. *See id.*

Even with *Healy*'s guidance, however, the boundaries of what constitutes wholly extraterritorial commerce are murky at best. *Cf.* Peter Felmly, Comment, *Beyond the Reach of States: The Dormant Commerce Clause, Extraterritorial State Regulation, and the Concerns of Federalism*, 55 Me. L. Rev. 467, 495 (2003) (noting that "the most difficult portion of the [extraterritoriality] analysis to unravel" is "when, under the blueprint the Supreme Court laid

31

down in *Healy*, a state's law has effects which occur 'wholly outside' the boundaries of the state"). Defendants assert that the core concerns underlying the Supreme Court's line of extraterritoriality cases are attempts by a state to establish a scale of pricing affecting interstate commerce or to pass laws that smack of economic protectionism. (Defs'. Mem. of Law in Opp'n to Summ. J. 5.) But *Healy*'s demarcation of laws that will fall afoul of the dormant Commerce Clause clearly extends far beyond these concerns. *See Healy*, 491 U.S. at 336-37. [14] This line also clearly extends beyond "cases where a state may force an out-of-state merchant to seek regulatory approval in one state before undertaking a transaction in another." *Empire State Beer Distrib. Ass'n v. Patterson*, No. 09-cv-10339, 2010 WL 749828, at *6 (S.D.N.Y. Mar. 1, 2010) (positing this limit on extraterritoriality). In fact, notwithstanding the references in *Healy* and its precursors to "wholly" extraterritorial commerce, *see Healy*, 491 U.S. at 332, 336; *Edgar*, 457 U.S. at 641-42, the Supreme Court and lower courts have invalidated the application of laws to commerce occurring, at least in part, within the regulating state, *see, e.g.*, *Healy*, 491 U.S. at 335-40 (striking down in-state price restrictions on alcohol that had the effect of limiting suppliers' out-of-state pricing options); *Brown-Forman*, 476 U.S. at 579-84 (same); *Seelig*, 294 U.S. at 527-28 (striking down statute setting minimum prices for in-state sales of milk and banning in-state resale of milk purchased for a lower price out-of-state).[15]

---

[14] Defendants also make too much of the "directly controls" language in *Healy*. *See Healy*, 491 U.S. at 336 ("[A] statute that *directly controls* commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority . . . .") (emphasis added). As discussed above, *see supra* note 12, this language should be understood as synonymous with the proscription against legislation having the practical effect of regulating extraterritorial commerce. Contra defendants' argument, whether the legislation "directly controls" extraterritorial commerce is not an independent factor in the analysis: even if the practical effect is indirect, a statute may still fall afoul of the dormant Commerce Clause, as the Supreme Court has repeatedly held. *See, e.g.*, *Healy*, 491 U.S. at 335-40 (striking down in-state price restrictions on alcohol that had the indirect effect of limiting suppliers' out-of-state pricing options); *Brown-Forman*, 476 U.S. at 579-84 (same); *Seelig*, 294 U.S. at 527-28 (striking down statute setting minimum prices for in-state sales of milk and banning in-state resale of milk purchased for a lower price out-of-state).

[15] It is true that *Healy*'s distillation of the principles controlling extraterritoriality analysis under the dormant

32

Ultimately, as the Supreme Court has acknowledged, there is no sharply drawn line separating laws which impermissibly regulate extraterritorial commerce from those which do not. *See Brown-Forman*, 476 U.S. at 579.[16]  Still, in grappling with whether the practical effect of a regulation is to control conduct beyond the boundaries of the State, the circuit courts have focused on the location (or locations) where the contract was formed.  For example, in *SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007), the Second Circuit considered the constitutionality of a Connecticut statute that prohibited the sale of any gift certificate, including gift cards and other "stored-value" cards, that was subject to inactivity or dormancy fees or that had an expiration date.  *Id.* at 187.  The statute was challenged by SPGGC, a company that sold several thousand gift cards in Connecticut each year, each with a one-year expiration date and a monthly fee that was triggered six months after the date of purchase.  *Id.*  In its challenge, the company argued that, by policing the terms and conditions of the sale of its gift cards, which were set according to a uniform standard across the United States, the statute effectively regulated commerce occurring outside of Connecticut.  *Id.* at 187, 192.  The Second Circuit rejected this argument, relying heavily on the Connecticut Attorney General's stipulation that the

---

Commerce Clause has been roundly criticized by scholars.  *See, e.g.*, Florey, *supra*, at 1087, 1090 (noting that the scope of the extraterritoriality principle as articulated by the Supreme Court is "so sweeping that most commentators have assumed that these cases cannot mean what they appear to say"); Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 789-790, 806 (2001) (calling *Healy*'s formulation "clearly too broad" and suggesting it may be ignored); Regan, *supra*, at 1896 (archly offering, as a summary of the extraterritoriality principle: "'For the most part, states may not legislate extraterritorially, whatever exactly that means'").  But, of course, scholarly debate about the validity of Supreme Court decisions does not excuse the lower courts from the obligation to apply them faithfully.

[16] In *Edgar*, a plurality of the Supreme Court suggested that the boundary is similar to the familiar line demarcating the jurisdiction of a state's courts.  *See* 457 U.S. at 643 ("The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts.").  However, the Court has subsequently cast considerable doubt on this suggestion.  *See Quill Corp. v. North Dakota*, 504 U.S. 298, 305-313 (1992) (discussing differing scope of and concerns animating the Due Process and Commerce Clauses); *cf. Midwest Title*, 593 F.3d at 668 ("[I]f the presence of an interest that might support state jurisdiction . . . dissolved the constitutional objection to extraterritorial regulation, there wouldn't be much left of *Healy* and its cognates."); *Carolina Trucks*, 492 F.3d at 491 ("If a state could leverage contacts within its borders to control a company's conduct elsewhere without being held to regulate extraterritorially, this would be the national market's undoing.").

statute applied only if the gift cards were actually sold within the state; even if cards were subsequently used in Connecticut, in the course of commerce conducted entirely within the state by Connecticut residents, they would be left unregulated if they had been sold out of state, thereby "permit[ting] cards purchased out of state to be used in Connecticut, despite any restrictions or fees such cards may carry." *Id.* at 187.   The Circuit held that, in light of this stipulation, there was no impermissible extraterritorial sweep. *See id.* at 194 ("The [statute] does not . . . directly regulate sales of gift cards in other states.   Nor does it prevent other states from regulating gift card sales differently within their own territories.").   In other words, under the state's interpretation of its own law, as sanctified by the Second Circuit, the statute was constitutional because it regulated only transactions within the state; whether any subsequent effects of the transaction—such as the use of the gift card—were felt out of state was irrelevant. *See also Freedom Holdings*, 624 F.3d at 66 (finding statute that applied only to cigarettes sold in the state did not regulate extraterritorially); *cf. Edgar*, 457 U.S. at 642 (noting that the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State").

In *A.S. Goldmen & Co. v. N.J. Bureau of Securities*, the Third Circuit also looked to the location of the transaction being regulated when determining whether the application of a state statute violated the dormant Commerce Clause.   A.S. Goldmen was a securities broker-dealer in New Jersey; in early 1996, it filed registration statements with the Securities Exchange Commission and regulatory authorities in over a dozen states for an initial public offering of a Delaware technology corporation.   163 F.3d at 782-83.   After the New Jersey Bureau of Securities threatened to issue a stop order blocking the offering in New Jersey, A.S. Goldmen entered a consent order with the regulator that permitted it to make unsolicited sales of the stock

34

offering from within New Jersey. *Id.* at 783. A.S. Goldmen then proceeded with the offering, soliciting purchases from individuals outside of New Jersey (notwithstanding the terms of the consent order), but not soliciting any purchases from individuals within New Jersey. *Id.* Pursuant to New Jersey's Blue Sky Law, which grants the authority to regulate the "offer or sale" of securities whenever the offer or sale is made within New Jersey, *see id.* at 782, the New Jersey regulator immediately issued a cease and desist order, *see id.* at 784.

In the resulting declaratory judgment action, A.S. Goldmen argued that the regulator's action, insofar as it blocked sales of the offering to individuals outside of New Jersey, unconstitutionally applied the New Jersey Blue Sky law to commerce occurring wholly outside the state; the regulator, by contrast, argued that the law had been constitutionally applied to commerce occurring entirely within the state. *Id.* at 786. The Third Circuit agreed that the key to the law's constitutionality was whether the provisions of the law had been applied to transactions that had occurred within the state, *see id.* at 785-86 (noting that the constitutionality of the statute's application depended "on the territorial scope of the transaction that the state law seeks to regulate") (citing, *inter alia*, *Hall v Geiger-Jones Co.*, 242 U.S. 539, 557 (1917) (upholding the constitutionality of Ohio's Blue Sky law where "'[t]he provisions of the law . . . apply to dispositions of securities *within* the state'")), but rejected both parties' arguments. The court reasoned that, under the modern approach to analyzing contracts, the locus of contract formation is not necessarily "rooted in a single geographical location, such as the place the offer was accepted"; rather, "when an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state." *Id.* at 786-87. Following this approach, the court held that all of A.S. Goldmen's offers to purchase stock had occurred in New Jersey, but the acceptance of such offers by non-New Jersey residents had occurred in the

purchaser's state of residence.  *See id.* at 787 ("A contract between Goldmen in New Jersey and a buyer in New York does not occur 'wholly outside' New Jersey, just as it does not occur 'wholly outside' New York.  Rather, elements of the transaction occur in each state . . . .").  Accordingly, New Jersey appropriately could regulate "the aspect of the transaction that occurs within its boundaries," *id.*, but not that part which occurred out of state.  *See id.* (holding that the New Jersey Blue Sky law "simply allows the Bureau to regulate its 'half' of the transaction—the offer that occurs *entirely* within the state of New Jersey") (internal footnote omitted).

In *Carolina Trucks & Equipment Inc. v. Volvo Trucks of North America, Inc.*, the Fourth Circuit addressed the related question of whether a state may regulate a transaction when no element of the transaction has occurred in-state, but the seller had placed in-state advertisements for the product.  At issue was whether a South Carolina law prohibiting a vehicle manufacturer from selling a motor vehicle in the state, other than via an authorized franchise, could be constitutionally applied to the out-of-state sales of trucks to South Carolina residents by the defendant's subsidiary at its truck lot in Atlanta, Georgia.  *Carolina Trucks*, 492 F.3d at 486-87.  The plaintiff argued that the South Carolina statute should be construed to regulate sales to South Carolina residents regardless of where they occurred, thereby rendering these sales unlawful.  The court summarily rejected this construction, reasoning in relevant part that it would violate the dormant Commerce Clause by projecting South Carolina's legislation into other states and regulating commerce wholly outside of the state's borders, notwithstanding the significant effects of that commerce within South Carolina.  *Id.* at 489-90.

Also of relevance here, the court rejected the plaintiff's alternative argument: that the sales occurred in part within South Carolina because the subsidiary had advertised within the state.  *Id.* at 488; *see also* 490-91 (quoting plaintiff's argument that, "[a]lthough [the subsidiary]

is physically located in Georgia, it entered South Carolina through direct mailings and phonebook advertisements").   Noting that the Supreme Court has deemed extraterritorial "statutes that seize upon a company's in-state commercial activities . . . to regulate the company's out-of-state conduct," the court held that "there was every reason to conclude" that this proposed construction of the statute would violate the dormant Commerce Clause as well. *Id.* at 491.   "Far better then," the court determined, "to conclude that these sales took place where in fact they did take place: at [the subsidiary's] lot in Georgia." *Id.* at 492.   In other words, South Carolina could not use the defendant's in-state commercial activities as a hook to regulate its out-of-state conduct.   Rather, the fact that the defendant's subsidiary had "entered" South Carolina (as the plaintiff termed it) by advertising in-state gave the State no additional license under the dormant Commerce Clause to regulate transactions consummated wholly out of state. *See id.* at 491-92; *cf. Star Scientific, Inc. v. Beales*, 278 F.3d 339, 356 (4th Cir. 2002) (upholding Virginia state regulating tobacco sales on the grounds that, "rather than regulate 'upstream transactions' outside of the State," it "impose[d] a fee only for cigarettes actually sold within the State").

    *Midwest Title Loans*, *Inc. v. Ripley*, 616 F. Supp. 2d 897 (S.D. Ind. 2009), *aff'd sub nom Midwest Title Loans v. Mills*, is perhaps most similar to the case here.   Midwest Title was an Illinois business corporation that issued car title loans, secured by the borrower's motor vehicle, to consumers in several states, including Indiana.   616 F. Supp. 2d at 900.   It had no business locations in Indiana, did not own or lease property in the state, and did not have a certificate of authority or license to do business in Indiana.   *Id.*   No Midwest Title agent or employee solicited business in person in Indiana, and all loan transactions were consummated in Illinois, where loan applications were made and approved and loan funds disbursed.   *Id.*   As in *Carolina Trucks*,

however, the corporation placed advertisements within the state targeting consumers.  *Id.* at 901.

In addition, the nature of the loan transaction required a continuing business relationship between

Midwest Title and Indiana borrowers, which occurred partly in-state: if a loan were approved,

Midwest would submit documentation to the Indiana Bureau of Motor Vehicles to perfect its

lien, place reminder and collection calls to borrowers in Indiana, and accept principal and interest

payments from Indiana residents via money order, certified check, and credit card.  *Id.* at 900-01.

Also—and of direct relevance to this case—where necessary, Midwest Title would contract with

a third-party repossession company to repossess vehicles licensed in Indiana, which were stored

in-state prior to being auctioned there.  *Id.* at 900 n.2.  Nonetheless, the district court found that

Indiana could not require Midwest Title to be licensed and regulated under the Indiana Uniform

Consumer Credit Code.  Citing the Seventh Circuit's decision in *Dean Foods v. Brancel*, 187

F.3d 609 (7th Cir. 1999),[17] for the proposition that "an element of the actual contract formation

must occur within a state for that contract to come within the purview of the state's laws"—and

so, for the purposes of extraterritoriality analysis, "the crucial contacts are those which form a

binding agreement: offer and acceptance of specific terms"—the court rejected the state's

---

[17] In *Dean Foods*, the Seventh Circuit addressed whether a state may regulate a transaction consummated out of state when the bulk of the preliminary negotiations to the contract occur in-state.  The plaintiff was an Illinois milk processor with significant contacts in Wisconsin: it leased property in the state, had employees located there, mailed business solicitations to Wisconsin milk producers, and was authorized to do business in the state as a foreign corporation.  187 F.3d at 611, 618.  Its representatives would often solicit business in person in Wisconsin and attempt to "enroll" producers in its milk purchasing program, which would entitle enrolled producers to deliver milk to its processing plants in Illinois and be paid at a preset rate, including premiums for large volumes.  *Id.* at 618-19.  Nonetheless, while acknowledging that these milk sales "have an effect that is felt, perhaps even predominantly, in Wisconsin," the Seventh Circuit determined that the application of a Wisconsin law prohibiting the payment of volume premiums to the plaintiffs' transactions with Wisconsin milk producers violated the dormant Commerce Clause.  *Id.* at 619-20.  The court rejected the defendant's argument that the court should look to the plaintiff's numerous and significant in-state contacts with Wisconsin farmers, and instead considered only where the transactions between the plaintiff and Wisconsin farmers took place.  Relying on the Uniform Commercial Code and the Restatement (Second) of Contracts, the Court held that all the sales occurred in Illinois, not Wisconsin.  All the transaction-related activity that occurred in Wisconsin, by contrast, amounted simply to "preliminary negotiations," which did not make the application of the statute to the plaintiff's Illinois milk purchases any less impermissibly extraterritorial.  *Id.* 617-19.

arguments that its law could be constitutionally applied to loans consummated outside Indiana because such loans may have resulted from an in-state solicitation or, in the alternative, because Indiana consumers could mail their payments from within the state.  *Id.* at 904-06 & n.5.

The Seventh Circuit upheld the district court's decision.  Reviewing the considerable body of literature targeting car title and other high cost, high risk loans for "trap[ping] borrowers in a cycle of debt," the court acknowledged Indiana's legitimate interest in regulating "predatory lending."  593 F.3d at 663-64 (internal quotation marks omitted).  Nonetheless, the court held that the application of Indiana's statute to Midwest Title's loans violated the dormant Commerce Clause.  *Id.* at 669.  That Midwest Title placed advertisements in Indiana did not alter this conclusion.  *Id.*  ("If Indiana cannot prevent Midwest from lending money to Hoosiers in Illinois, it cannot prevent Midwest from truthfully advising them of this opportunity.").  Nor did the fact that Midwest, via a third-party repossession company, seized Indiana borrowers' automobiles within the state in the event of default.  *Id.* ("A contract can always go wrong and if it does the consequences will often be felt in a different state . . . .").  Nor did the court appear troubled by the fact that Indiana borrowers' performance of their contractual obligations occurred in-state— the court did not even address this aspect of the contract—nor by the possibility that Midwest might potentially use Indiana's courts to enforce the debts.  *Id.* at 668-69.  The sole relevant question for the extraterritoriality analysis was where the loan transaction had occurred: in the court's words, "[t]he contract was . . . made and executed in Illinois, and that is enough to show that the [application of the statute] violates the commerce clause."  *Id.* at 669.

While not always analyzed explicitly in these terms, decisions in other circuits are largely consistent with the line established in these cases, striking down statutes applying to transactions consummated out of state, but upholding statutes applying only to in-state transactions.  *See, e.g.*,

*Quik Payday*, 549 F.3d at 1308-09 (upholding Kansas statute regulating payday loans after state conceded it only "regulates the conduct of . . . lenders who choose to make payday loans with Kansas consumers *while they are in Kansas*"); *Philip Morris*, 267 F.3d at 63-64 (upholding Massachusetts disclosure requirements for cigarette manufacturers applying only to tobacco products "sold in the commonwealth"); *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 81-82 (1st Cir. 2001), *aff'd sub nom Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003) (rejecting facial challenge to Maine prescription-drug statute that "[did] not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect," but only in-state sales); *Cotto Waxo*, 46 F.3d at 792-94 (construing Minnesota statute prohibiting sales of petroleum-based sweeping compounds as applying only to in-state sales of compounds and therefore satisfying dormant Commerce Clause); *Pharm. Research & Mfrs. of Am. v. District of Columbia*, 406. F. Supp. 2d 56, 67-71 (D.D.C. 2005) (invalidating application of D.C. prescription-drug statute to sales of drugs by out-of-state manufacturers to out-of-state wholesalers, even though statute was triggered only in the event of a subsequent in-state consumer purchase).[18]   So, too, are at least several district court decisions within this circuit. *See, e.g.*, *Houston v. Seward & Kissel, LLP*, No. 07-cv-6305, 2008 WL 818745, at *5 (S.D.N.Y. Mar. 27, 2008) (upholding application of Oregon's Blue Sky law to New York law firm where application was "limited to the sale of securities in the state" and securities buyer received offering materials and made purchase in Oregon); *S.K.I. Beer Corp. v. Baltika Brewery*, 443 F.

---

[18] The statute upheld in *Quik Payday* contained a provision stating that a loan would be deemed to have been made in Kansas if "the creditor induces the consumer who is a resident of this state to enter into the transaction by solicitation in this state by any means." 549 F.3d at 1305. On first blush, the scope of this provision would appear to extend beyond the boundaries set by the dormant Commerce Clause, at least if construed as allowing regulation of only transactions actually consummated in-state. However, as the district court in *Ripley* noted, *see* 616 F. Supp. 2d at 905, the state in *Quik Payday* conceded that it would not attempt to apply the statute in situations where a Kansas consumer left the state to acquire the loan, *see* 549 F.3d 1308. Thus, under the state's interpretation, only if the borrower applied for the loan from Kansas would the transaction be subject to regulation in Kansas, a concession that was central to the Tenth Circuit's upholding the statute. *See* 549 F.3d at 1308.

Supp. 2d 313, 319-20 (E.D.N.Y. 2006) (rejecting proposed construction of New York statute as applying to all transactions between brewers and New York wholesalers, not only those where the sale or offer occurred in-state), *aff'd on other grounds*, 612 F.3d 705 (2d Cir. 2010); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 720 F. Supp. 284, 287-88 (S.D.N.Y. 1989) (striking down provision of New York statute requiring out-of-state agents and dealers to forward notice to out-of-state manufacturers of any consumer complaint that a vehicle purchased in New York had failed to conform to express contractual warranties).[19]

Thus, following the line that has been established in these cases, the Court looks to where the transaction being regulated was consummated to determine whether the application of a law impermissibly regulates extraterritorial commerce. *Cf.* Regan, *supra*, at 1899 (noting that the extraterritoriality principle is concerned with "the location of the regulated behavior itself"). Quite simply, if the transaction is consummated out of state, a state may not regulate it without violating the dormant Commerce Clause.[20] This is the case regardless of whether some other aspect of the commercial activity occurs within the state—whether it be the use of the product or service within the state, *cf. Mills*, 593 F.3d at 668-69; *SPGGC*, 505 F.3d at 193-94, the subsequent in-state sale of the product or service, *cf. Pharm. Research*, 406. F. Supp. at 67-71; *Abrams*, 720 F. Supp. at 287-88, prior negotiations or advertising in-state that lead to the

---

[19] In *Abrams*, the New York statutory provision applied only to motor vehicles sold and registered in New York. *See* 720 F. Supp. at 287. But the commercial relationship that the notice provision impermissibly regulated was that between out-of-state agents and dealers and manufacturers, not the commercial relationship between these entities and the in-state consumer. In other words, it was the commercial relationship between business entities, and not the consumer transaction, that was at issue under the Commerce Clause.

[20] Indeed, as demonstrated by the Supreme Court's cases involving pricing restrictions, even the regulation of in-state transactions may violate the dormant Commerce Clause if "the practical effect of the regulation is to control conduct beyond the boundaries of the State," *Healy*, 491 U.S. at 336. *See id.* at 335-40 (striking down in-state price restrictions on alcohol that had the effect of limiting suppliers' out-of-state pricing options); *Brown-Forman*, 476 U.S. at 579-84 (same); *Seelig*, 294 U.S. at 527-28 (striking down statute setting minimum prices for in-state sales of milk and banning in-state resale of milk purchased for a lower price out-of-state).

formation of the contract out-of-state, *cf. Carolina Trucks*, 492 F.3d at 491-92; *Dean Foods*, 187 F.3d at 617-19, or the fact that one of the parties is a state resident, *cf. Quik Payday*, 549 F.3d at 1308-09; *Carolina Trucks,* 492 F.3d at 489-90, a domestic corporation, *cf. S.K.I. Beer*, 443 F. Supp. 2d at 319-20, or has significant in-state contacts, *cf. Dean Foods*, 187 F.3d at 618-19. By the same token, the in-state presence of one party to the transaction cannot be used as justification to regulate the other party, *cf. A.S. Goldmen*, 163 F.3d 786-87, nor, critically to this case, can the in-state performance of a counterparty be used to regulate the other party, *cf. Mills*, 593 F.3d at 668-69; *Ripley*, 616 F. Supp. 2d at 904-06 & n.5. If the transaction at issue is consummated out of state, none of these in-state "hooks" will permit a state to regulate the extraterritorial commerce. Even a de minimis regulation may fall afoul of the Constitution. *Cf. Abrams*, 720 F. Supp. at 287-88 (holding that notice requirement for malfunctioning vehicles, "[i]nnocuous as it is," violated the Commerce Clause).

### a. *Defendants' Motion*

Defendants argue that the application of Local Law 15 to out-of-state debt buyers that contract with third-party debt collectors and law firms to collect on debts owed by New York City consumers does not violate the dormant Commerce Clause. In defendants' view, because the collection activity occurs within the state, debt buyers' contracts with debt collectors and law firms are not wholly extraterritorial, even if formed out of state, and thus New York City may regulate these debt buyers without falling afoul of the dormant Commerce Clause. The Court disagrees. As set out above, the critical question under the dormant Commerce Clause is where the transaction being regulated is consummated. Consequently, the key issue here is where DBA's contracts with third-party debt collectors and law firms are formed. Resolving all ambiguities in the evidence and drawing all permissible factual inferences in plaintiffs' favor, the

Court finds that there is a genuine issue of material fact as to where DBA's contracts are formed and, in turn, as to whether Local Law 15's application to DBA is unconstitutional.

As a preliminary matter, it is necessary to resolve at what point an out-of-state debt buyer like DBA becomes subject to New York City's debt regulation regime. Plaintiffs argue that, under the amendments enacted by Local Law 15, DBA cannot even contract with a third-party debt collector or law firm to collect on a New York City debt without first obtaining a DCA license. Defendants, by contrast, argue that the Law does not apply until a debt buyer actually attempts to collect on a New York City debt via a third-party debt collector or law firm. A plain reading of the ordinance supports defendants' interpretation. Under the amended definition of "debt collection agency," a debt buyer "who seeks to collect" a debt "either directly or through the services of another by, including but not limited to, initiating or using legal processes or other means to collect or attempt to collect such debt," must obtain a DCA license. N.Y. City Admin. Code §§ 20-489, 20-490. By the code's own terms, a debt buyer must "initiate or use legal processes"—not simply hire an attorney—to trigger the license requirement. Similarly, the statutory language requiring a debt buyer to obtain a license only at the point it "seeks to collect" a debt contemplates an affirmative step beyond simply hiring a third-party debt collector. *Cf.* Merriam-Webster's Collegiate Dictionary 1285 (11th ed. 2008) (defining "to seek" as, *inter alia*, "to go in search of : look for," "to ask for," "to try to acquire or gain," or "to make an attempt"). Beyond the plain legislative language, defendants' reasonable interpretation of the law under which they function is entitled to deference. *See In re Application of Burrito Factory, Inc.*, 270 A.D.2d, 217, 706 N.Y.S.2d 383 (1st Dep't 2000) (noting that city agency's "reasonable, rational interpretation and application of the Code sections under which it functions are entitled to judicial deference"). Moreover, if plaintiffs' proposed construction were adopted, the

43

amendments made by Local Law 15 clearly would be unconstitutional.  *See Healy*, 491 U.S. at 337 ("[T]he Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.") (citing *Brown-Forman*, 476 U.S. at 582).  Where possible, the Court will construe legislation susceptible to more than one reading so as to avoid constitutional difficulties.  *See, e.g.*, *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 354 (2d Cir. 2008).  For these reasons, the Court adopts defendants' interpretation of when the licensing requirement is triggered.[21]

Nonetheless, even under defendants' construction, there is a genuine issue of material fact as to whether Local Law 15's application to DBA impermissibly regulates extraterritorial commerce.  Although Local Law 15 is not triggered until some affirmative attempt is made to collect on a New York City debt, the basis for New York City's regulation of foreign debt buyers like DBA is the contractual relationship that these entities form with third-party debt collection agencies and law firms to collect on New York City debts on their behalf.  Accordingly, the Court looks to where these contracts are formed—a question of state law—to determine whether Local Law 15 is being impermissibly applied to extraterritorial commerce.  Plaintiffs assert that DBA's contracts with third-party debt collectors and law firms are entered into outside of New York, assumedly—although plaintiffs do not state so explicitly, nor provide any evidence in support of their contention—in Delaware, the state in which DBA is incorporated and has its principal place of business.  Under Delaware law, a contract is formed when there is an offer, acceptance, consideration, and a meeting of minds on all essential terms of the contract.  *See*

---

[21] Plaintiffs claim that DBA's contracts with debt originators to purchase New York City debts are also formed outside New York state.  While neither party appears to argue that Local Law 15's licensing requirement would be triggered by a debt buyer's out-of-state purchase of a New York City debt, this application would—for the same reason—violate the dormant Commerce Clause.  See *Healy*, 491 U.S. at 337 ("[T]he Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.").

*Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. Ct. 1986); *Hindes v. Wilmington Poetry Soc'y*, 138 A.2d 501, 503 (Del. Ch. Ct. 1958).[22]  Drawing all permissible factual inferences in plaintiffs' favor, as the Court must do in assessing defendants' motion, *see, e.g., Sec. Ins. Co. of Hartford*, 391 F.3d at 83, the very limited record presented to the Court supports plaintiffs' claim that the essential elements of DBA's contracts occur outside New York.  Accordingly, defendants' summary judgment motion must be denied.

Defendants struggle to avoid this conclusion by arguing that, regardless of where these contracts are formed, they cannot be deemed wholly extraterritorial because they concern conduct that occurs wholly within the state.  In defendants' view, by attempting to collect on New York City debts via such contracts, a debt buyer like DBA "projects itself" into New York, thereby rendering it subject to in-state regulations.  (*See* Defs.' Mem. of L. in Opp'n to Summ. J. at 5-6.).  While defendants' explanation of how a debt collector may "project" itself into a state via its contractual relationships is creative, it is simply not the correct analysis to determine whether a regulation violates the dormant Commerce Clause.  In arguing that New York City's regulatory authority may properly be asserted on this basis, defendants are claiming that foreign debt buyers like DBA may be subject to licensing merely because counter-parties to their contracts perform their contractual obligations within the state.   These in-state activities, however, are the consequence of transactions that are—at least, as plaintiffs assert regarding DBA's contracts—consummated entirely out-of-state, and the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State."  *Edgar*, 457 U.S. at 642; *see also Dean Foods*, 187 F.3d at 619-20 ("[T]he fact that a particular transaction may affect or impact a

---

[22] Similarly, under New York law, a contract comes into existence with "an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004).

state does not license that state to regulate commerce which occurs outside its jurisdiction."). The fact that the debt collectors and law firms with which DBA contracts may enter New York City to perform their contractual obligations is irrelevant on this point.  *See, e.g.*, *Ripley*, 593 F.3d at 669; *Carolina Trucks*, 492 F.3d at 491 (noting that state cannot "seize upon . . . in-state commercial activities" to regulate "companies' out-of-state conduct"); *Goldmen*, 163 F.3d at 786 (noting that the constitutionality of the statute's application depends "on the territorial scope of the transaction that the state law seeks to regulate").[23]

The Seventh Circuit's decision in *Ripley* is instructive in this regard.  As in this case, the government body in *Ripley* sought to regulate a corporation on the basis of, *inter alia*, out-of-state contracts under which the counter-party's performance occurred in-state: while Midwest Title's loan transactions were formed in Illinois, debtors could perform their contractual obligations—making principal and interest payments on the debts—from within Indiana. Nonetheless, the Seventh Circuit deemed Indiana's attempt to license Midwest Title unconstitutional, based solely on where the company's contracts with debtors came into existence.  In the court's words, the contracts were "made and executed in Illinois, and that is enough to show that the [application of the statute] violates the commerce clause."  593 F.3d at 669.  That Midwest Title, when necessary, contracted with third-parties to repossess and auction

---

[23] Defendants' reliance on *Silver v. Woolf*, 694 F.2d 8 (2d Cir. 1982), is unavailing.  In *Silver*, the Court upheld the application of Connecticut's debt collection licensing requirements and regulations as applied to a Pennsylvania debt collector that regularly attempted to contact debtors in-state, via telephone and letter, although it did not physically enter the state nor have offices or employees located there.  *Id.* at 9.  That the debt collector itself attempted to collect debts within the state is a critical distinction: by doing so, the debt collector engaged in in-state commerce, and the state was free to regulate it on this basis.  Moreover, *Silver* was decided prior to the Supreme Court's decisions in *Brown Forman* or *Healy*.  Its analysis, which focused on the state's interest in regulating debt collection activity, as affirmed under the FDCPA, *see id.* at 11-13, is entirely distinct from the analysis set out in these cases, which focuses entirely on whether the conduct regulated is extraterritorial or not.  *Cf.* Florey, *supra*, at 1091 ("The [Supreme Court's extraterritoriality] cases are unconcerned with the number or nature of contacts between the legislating state and the targeted out-of-state activity . . . .").   Thus, while *Silver*'s holding is consistent with that dictated by *Healy* and *Brown Forman*, insofar as its rationale is entirely different, it is not clear to what extent the decision remains good law.

the loan collateral within Indiana was also irrelevant to the extraterritoriality analysis, since "[a] contract can always go wrong and if it does the consequences will often be felt in a different state." *Id.*  Just as in *Ripley*, New York City here reaches to regulate an out-of-state corporation on the basis of contracts formed—at least purportedly—outside the state.  But if these contracts are indeed formed out-of-state, the in-state performance of the counter-parties may not be used as the crutch to regulate DBA without violating the Commerce Clause.  *See id.*  Of course, New York City may regulate the activities of debt collectors operating within its jurisdiction, and New York State may do the same for attorneys.  This is to say nothing more than a state may regulate in-state commerce.  But this authority does not give the state or its municipalities license to regulate extraterritorial commerce.[24]

Certainly, the contractual relationship between a debt buyer like DBA and a third-party debt collector or law firm is of a different nature than that at issue in *Ripley*—namely, the relationship between an originating creditor and a debtor.  Under Delaware law, a law firm engaged to collect debts on behalf of a debt buyer acts as the debt buyer's agent, *see Trans World Airlines, Inc. v. Summa Corp.*, 394 A.2d 241, 245 (Del. Ch. 1978), and a third-party debt collector so engaged may act as either the debt buyer's agent (or "servant," under Delaware terminology) or as an independent contractor, *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57-60 (Del. 1997) (discussing difference between "servants" and "independent contractors" under Delaware law).  The same is true under New York law.  *See Burger v. Brookhaven Med. Arts*

---

[24] To put it a slightly different way, the State may regulate that portion of interstate commerce that occurs within its jurisdiction.  *Cf. Goldmen*, 163 F.3d at 785 ("[S]tates are permitted to regulate in-state components of interstate transactions so long as the regulation furthers legitimate in-state interests.").  Here, the only portion of interstate commerce that purportedly occurs within New York is the performance of the counter-parties to DBA's contracts.  Thus, New York State (and New York City, but only to the extent that the exercise of its power is not inconsistent with State law, *see* N.Y. Const. art IX, § 2(c); N.Y. Mun. Home Rule Law § 10) may regulate the debt collectors and law firms with which DBA contracts to collect debts on its behalf within New York, but not DBA itself, at least not on the basis of contracts formed entirely outside New York.

*Bldg., Inc.*, 131 A.D.2d 622, 623, 516 N.Y.S.2d 705 (2d Dep't 1987) (noting law firm is client's agent); *Melbourne v. N.Y. Life Ins. Co.*, 271 A.D.2d, 296, 97 707 N.Y.S.2d 64 (1st Dep't 2000) (discussing difference between "agents" and "independent contractors" under New York law). Arguably, the nature of the contractual relationships involved here—whether principal-agent or principal-independent contractor—creates a more substantial connection with New York than was the case in *Ripley*, although it is not immediately evident why New York should necessarily have a greater interest in regulating this relationship than did Indiana in regulating creditors conducting loan transactions with its citizens. But even if this is the case, it does not affect the extraterritoriality analysis. *Cf.* Florey, *supra*, at 1091 ("The [Supreme Court's extraterritoriality] cases are unconcerned with the number or nature of contacts between the legislating state and the targeted out-of-state activity . . . .").

Defendants note that a principal may be held liable for the actions of its agents. Of course this is true. If a New York City debtor chooses to sue a debt collection organization or law firm that DBA has engaged to act on its behalf in a New York State court, then DBA, all else being equal, will be subject to the court's jurisdiction and may be held liable for any wrongdoing. In fact, whether any wrongdoing has occurred might well be evaluated under New York law. *Cf. Ripley*, 593 F.3d at 668-69 (discussing choice of law in potential debtor lawsuits). But it is one thing for a private party to subject a principal to suit in a state's courts. It is entirely another for the state or one of its municipalities to subject the principal—where the principal has not entered the state, but has instead merely entered into a contract formed entirely outside the state, under whose terms the principal's performance also occurs entirely outside the state—to wholesale regulation. The former is permissible under the Due Process clause; the latter is impermissible under the Commerce Clause. *Cf. Quill Corp.*, 504 U.S. at 305-313 (discussing

48

differing scope of and concerns animating the Due Process and Commerce Clauses).[25]

Even a de minimis regulation of extraterritorial commerce may violate the Commerce Clause. *Cf. Abrams*, 720 F. Supp. at 287-88 (holding that notice requirement for malfunctioning vehicles, "[i]nnocuous as it is," violated the Commerce Clause). But the regulatory requirements that New York City seeks to impose on out-of-state debt buyers like DBA are, in any event, significant. Under the new sections added by Local Law 15, N.Y. City Admin. Code §§ 20-493.1 and 20-493.2, and the regulations promulgated thereunder, Rules of the City of New York, tit. 6, ch. 2 §§ 2-190, 2-191, 2-192, 2-194, debt collectors are required to provide certain information to debtors and are prohibited from using certain debt collection practices. The DCA Commissioner is authorized to enforce these provisions and investigate violations thereof. *See* N.Y. City Admin. Code § 20-493. The Commissioner is also empowered to "make and promulgate such rules and regulations as may be necessary" to implement and enforce the law related to debt collection agencies and to "investigate the business, business practices and business methods of any debt collection agency," if, in his opinion, such investigation is warranted. *Id.* In order to facilitate the Commissioner's investigatory power, debt collection agencies must retain extensive records[26] and are required to supply any requested information

---

[25] By the same token, if DBA engages a law firm to bring suit against a debtor in New York State court, it will be deemed to consent to the jurisdiction of the court over any counterclaims brought by the debtor. *See Adam v. Saenger*, 303 U.S. 59, 67-68 (1938). But the fact that the filing of an in-state lawsuit will permit the exercise of jurisdiction by New York's courts under the Due Process clause does not mean that this activity also permits wholesale regulation by the state or its municipal entities under the Commerce Clause.

[26] Debt collectors are required to maintain a separate file for each debtor containing a copy of all communications with the debtor, a record of each payment received (including the date of payment, the method of payment, and the debt to which it is applied), a copy of any debt payment schedule or settlement agreement with the debtor, and—for debt buyers—details regarding the purchase of the debt (including the name and address of the debt seller, the date of the purchase, and the amount of the debt at the time of the purchase). *See* Rules of the City of New York, tit. 6, ch. 2 § 2-193(a). For "all consumers from whom it seeks to collect a debt," the agency must keep a monthly log of all calls made (including the date, time and duration of each call; the number called; and the name of the person reached), recordings of complete conversations with all consumers or a randomly selected sample of at least 5% of all calls made or received by the agency, and a record of all cases filed in court to collect a debt (including the name of the consumer and originating creditor; the amount claimed; the case number; the date the case was filed; the name

concerning their business practices and methods, or its proposed business practices or methods, as well as their books and records, upon the DCA's request. *Id.* The Commissioner and his representatives may also enter the business premises of debt collection agencies at any time during business hours to inspect these documents, which debt collectors must make available. *See* Rules of the City of New York, tit. 6, ch. 1 § 1-16. Finally, debt collection agencies must respond in writing to the DCA within 20 days of receiving any consumer complaint, setting out the agency's position on the complaint and the facts which it believes justify this position. *See id.* § 1-13. The agency must respond to any subsequent communications from the DCA concerning the complaint within 10 days of receipt. *See id.*

Under Local Law 15, out-of-state debt buyers that contract with third-party debt collectors or law firms outside the state to collect on New York City debts must still comply with these, far from innocuous, but rather extensive and burdensome regulations, face sanctions, *see id.* § 20-494, or cease doing business in New York City. This extension of the DCA's authority to these out-of-state debt buyers, based on contracts formed outside the state, has the practical effect of exporting New York's domestic policies into other states. *Cf. Brown-Forman*, 476 U.S. at 582-83 ("[New York] may not 'project its legislation into [other States]'") (quoting *Seelig*, 294 U.S. at 521). In so doing, Local Law 15 creates a clear risk that out-of-state debt buyers will be subjected to inconsistent regulations should other states adopt similar legislation. *Cf. Healy*, 491 U.S. at 336 ("The practical effect of the statute must be evaluated not only by considering the

---

of the process server who served process; the date, location and method of service of process; the affidavit of service; the original copy of each contract with a process server for the service of process; copies of all documents involving traverse hearings relating to cases filed; and the disposition for each case filed). *See id.* § 2-193(b). Finally, each agency must keep records regarding its general operations and business practices, including a copy of all actions, proceedings or investigations by government agencies that resulted in the revocation or suspension of a license, the imposition of fines or restitution, a voluntary settlement, a court order, a criminal guilty plea or a conviction, as well as a copy of all policies, training manuals, and guides for employees or agents concerning collection activities. *See id.* § 2-193(c).

consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.").[27]   Indeed, if New York City may regulate these out-of-state debt buyers, so might any other municipality.  A debt buyer like DBA might thereby be subjected to regulation by any state or municipality into which a third–party debt collector enters on its behalf to collect on a debt.  In this eventuality, it would be improbable in the extreme if each of the regulating entities were to impose the same limitations on debt buyers; far more likely would be a balkanized multitude of overlapping and conflicting regulations—a regulatory Tower of Babel the Commerce Clause is understood to bar.[28]   Local Law 15 undoubtedly invites the very inconsistencies that the dormant Commerce protects against, *see Healy*, 491 U.S. at 336 ("Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State."), and risks the very pressures on national solidarity that the Commerce Clause is designed to prevent, *see Carolina Trucks,* 492 F.3d at 490 ("[O]ne

---

[27] At least two decisions in this Circuit have stated that there must be an actual conflict, not just a potential conflict, between the regulatory regimes of different states to pose a problem under the Dormant Commerce Clause. *See Sorrell*, 272 F.3d at 112; *Silver*,  694 F.2d. at 14.  This may be the case if the conflict is the sole basis for the Commerce Clause claim, *see Silver*, 694 F.2d. at 14, or is the sole incidental burden imposed on interstate commerce under the *Pike* analysis, *see Sorrell*, 272 F.3d at 112, but the Supreme Court has stated repeatedly that the potential for inconsistent regulations is relevant to the extraterritoriality analysis.  *See Healy*, 491 U.S. at 336 ("The practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, *but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation*.") (emphasis added); *Brown-Forman*, 476 U.S. at 583 (reasoning that "the proliferation of state affirmation laws . . . *has greatly multiplied the likelihood that a seller will be subjected to inconsistent obligations in different States*") (emphasis added).  Indeed, as discussed above, the risk of inconsistent regulations—as well as the resulting risk to national solidarity—is inextricably related to the problem of regulating extraterritoriality.  *See supra* note 13.

[28] Furthermore, even in the unlikely eventuality that no direct conflict among regulatory requirements occurred, if one regulatory body prohibited business practices permitted by others, or simply imposed a more onerous burden than others, these differing regulatory demands would still implicate the concerns against which the dormant Commerce Clause protects.  *See Mills*, 593 F.3d at 667-68 (reasoning that allowing one state to trump the legislative determinations of another in this manner "would be arbitrarily to exalt the public policy of one state over that of another").

extraterritorial burden can easily lead to another.  When one state reaches into another state's affairs or blocks its goods, 'the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation.'") (quoting *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 532 (1949)).

Accordingly, to the extent that Local Law 15 regulates contracts formed entirely outside of the state, it violates the United States Constitution.

### b.  *Plaintiffs' motion*

Nonetheless, lawsuits are not run in a factless vacuum.  Here, plaintiffs simply have not provided sufficient evidence as to the particulars of DBA's contracts with debt collectors and law firms to support summary judgment on their behalf on extraterritoriality grounds.  In support of their motion, aside from the arguments made in the briefing papers, plaintiffs rely on a single conclusory statement in the declaration of the late Eric Berman.  According to this averment, based on Berman's personal knowledge as one of the company's shareholders and officers, DBA:

> purchases and takes assignment of consumer debt or debt portfolios . . . pursuant to contracts entered into outside of the state of New York.  DBA Holdings does not contact debtors directly, either in New York State, New York City or elsewhere.  Rather, DBA Holdings enters into contracts outside of the State of New York with debt collectors and law firms, who in turn attempt to recover amounts due and owing on DBA Holdings' consumer debt portfolios, including consumer debts owed by New York City debtors.

(Berman Decl. ¶ 3.)  This statement is insufficient to support summary judgment.

Under Federal Rule of Civil Procedure 56, a party asserting that a fact cannot be genuinely disputed has the burden of supporting this assertion by "citing to particular parts of materials in the record, including . . . affidavits or declarations," or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party

cannot produce admissible evidence to support the fact." *Id.* 56(c). Here, the relevant question requiring factual support is whether DBA's contracts with debt collectors and law firms are extraterritorial or not. As indicated above, the answer to this question is extremely fact sensitive, resting on where the essential elements necessary for contract formation took place.

The record, however, is bereft of such evidence. As defendants point out, Berman's bald assertion that DBA's contracts with debt collectors and law firms are entered into "outside of the State of New York" does little more than restate the legal conclusion that these contracts are extraterritorial. As a legal conclusion, it cannot support summary judgment. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (holding that district court properly refused to rely on affidavits to the extent that they contained only legal conclusions); *Suzy Phillips Originals, Inc. v. Coville, Inc.*, 939 F. Supp. 1012, 1019 (E.D.N.Y. 1996) (holding that plaintiff's attempt to depict legal conclusion as factual assertion was insufficient to create material issue of fact). Even if construed as a factual assertion, the statement is entirely conclusory. No representations are offered regarding the location of where, for any of DBA's contracts (let alone all), the offer and acceptance were made, where consideration was tendered, or where the parties were located when a meeting of minds as to the essential terms of the contract was reached. *See Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. Ct. 1986) (discussing contractual requirements under Delaware law); *Hindes v. Wilmington Poetry Soc'y*, 138 A.2d 501, 503 (Del. Ch. Ct. 1958) (same); *cf. Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (same under New York law). Without such evidence, the Court cannot determine whether DBA's contracts are, in fact, wholly extraterritorial. This unresolved question creates a genuine issue of material fact that precludes summary judgment.[29]

---

[29] For much the same reasons, the statement in plaintiffs' complaint that "[t]he relationships between DBA Holdings

In fact, even were it more robust, the declaration would be insufficient for summary judgment to be granted to plaintiffs.  While the Court may accept uncontested statements in declarations and affidavits for their truth in summary judgment proceedings, *see Weinstein v. Albright,* 261 F.3d 127, 137 (2d Cir. 2001); *C.R.A. Realty Corp. v. Tri–South Investments,* 738 F.2d 73, 78-79 (2d Cir. 1984), such statements must still meet certain requirements.  Under Rule 56, an affidavit or declaration used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  At bar, the late declarant will not be able to testify as to the contents of his declaration.  Accepting his averment for the purpose of demonstrating the particulars of DBA's contracts would violate the prohibition against hearsay evidence, *see* Fed. R. Evid. 802, and none of the exceptions to this prohibition appears to apply here, *see id.* 803, 804, 807 (setting out exceptions to hearsay rule).  By consequence, even were it to contain far more detailed factual assertions, the declaration could not be used to support plaintiffs' summary judgment motion without setting forth facts taking the statements, by exception or otherwise, beyond the proscriptions of hearsay.

Because plaintiffs have failed to present adequate support for their assertion that DBA's contracts with debt collectors and law firms are extraterritorial in all material respects, the Court denies their motion for summary judgment on these grounds.  *Cf. id.* 56(e)(4) (giving the Court discretion to issue any appropriate order if a party fails to support an assertion of fact).

### 2.  *Pike Analysis*

---

and the debt collectors it engages to seek to recover on debts are governed by contracts that are entered into outside of NY state," is insufficient.  (Compl. ¶ 53.)  Even if this statement is construed as a factual assertion, rather than a conclusion of law, it is far too thin a reed to support summary judgment.  *Cf. S.K.I. Beer Corp. v. Baltika Brewery*, 443 F. Supp. 2d 313, 323 (E.D.N.Y. 2006) (holding that conclusory allegation in complaint was insufficient to demonstrate that defendant offered to sell goods within New York).

The attack on the City's ordinance does not end there.  In the alternative, plaintiffs argue that, even if Local Law 15 does not impermissibly regulate extraterritorial commerce, the burdens it imposes on interstate commerce clearly outweigh their putative local benefits. Defendants argue that the code provision does not impermissibly burden interstate commerce and that, even if it does, any burdens are outweighed by the local benefits of the law.  For the reasons given below, the Court denies summary judgment on this federal constitutional claim to both plaintiffs and defendants.

Even if a law does not discriminate against interstate commerce or regulate wholly extraterritorial commerce, it may still violate the dormant Commerce Clause.  As the Supreme Court said in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970),

> [w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.  If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142 (internal citation omitted).  In other words, the Court must examine (1) whether any incidental burden is placed on interstate commerce by the statute, (2) the nature of the local benefits advanced by the statute, and (3) whether the incidental burden is "clearly excessive" when weighed against these benefits.  *Id.*  The Second Circuit has made clear that the "incidental burdens" that are relevant under *Pike* are "the burdens on interstate commerce that exceed the burdens on intrastate commerce."  *N.Y. State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1308 (2d Cir. 1994).  The "local benefits" are those that adhere to the jurisdiction regulated by the governmental authority passing the statute.  *See, e.g.*, *Francarl Realty Corp. v. Town of E. Hampton*, 375 F. App'x 145, 147 (2d Cir. 2010) (analyzing benefits to town of town regulation);

*Auto. Club of N.Y., Inc. v. Dykstra*, 423 F. Supp. 2d 279, 284 (S.D.N.Y. 2006) (examining benefits to New York City of DCA policy), *aff'd on other grounds*, 520 F.3d 210 (2d Cir. 2008).

The existence and extent of the burdens and benefits under the *Pike* analysis is a question to be determined by the finder of fact. *See Town of Southold*, 477 F.3d at 51. It is plaintiffs' burden to demonstrate both that the statute places some incidental burden on interstate commerce and that this burden is clearly excessive in relation to the putative benefits. *See USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1291-92 (2d Cir. 1995). Accordingly, summary judgment would be appropriate for defendants if "no reasonable factfinder could find that the statute's 'incidental burdens on interstate commerce' are 'clearly excessive in relation to the local benefits.'" *Jorling*, 16 F.3d at 1308. Conversely, summary judgment would be appropriate for plaintiffs if no reasonable factfinder could find to the contrary.

As evident in the requirement that any burdens on interstate commerce "clearly outweigh" the local benefits of a statute, the *Pike* analysis is a "permissive" one. *See Town of Southold*, 477 F.3d at 47. Considerable deference must be given to the legislature's policy determinations as to the local benefits of the challenged legislation. *See Jorling*, 16 F.3d at 1308 ("'[T]he judiciary may not sit as a superlegislature to judge the wisdom . . . of legislative policy determinations.'") (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)); *cf. CTS Corp.*, 481 U.S. at 92 (declining to "second-guess the empirical judgments of lawmakers concerning the utility of legislation") (internal quotation marks omitted). Nonetheless, it remains incumbent on the court to assess whether the purported local benefits of a statute or ordinance are legitimate or illusory. *See Town of Southold*, 477 F.3d at 52 (criticizing the district court for failing to "engage in any meaningful examination of the claimed local benefits" of the town's enactment); *cf. Edgar*, 457 U.S. at 644-45 (concluding that purported benefits of state statute

56

were largely speculative); *Motor Vehicle Mfrs. Ass'n of U.S.*, 720 F. Supp. at 290 (collecting Supreme Court cases striking down state statutes under the Commerce Clause because "the states' asserted safety rationales were illusory").[30]

### a. Defendants' motion

<u>Burdens</u>

Defendants contest that Local Law 15 poses any incidental burden on interstate commerce. "[A]t a minimum," for the law to have an incidental burden, it "must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Town of Southold*, 477 F.3d at 50 (internal quotation marks omitted). The Second Circuit has recognized several circumstances where this will be the case: for instance, when the challenged statute imposes a regulatory requirement inconsistent with those of other states, regulates commercial activity that takes place wholly beyond the state's borders, or reduces the flow of interstate commerce. *See id.*; *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 77 (2d Cir. 1998); *USA Recycling, Inc.*, 66 F.3d at 1287.[31]

As discussed above, under Local Law 15, out-of-state debt buyers that contract with

---

[30] In adopting amendments to the Administrative Code, the New York City Council, of course, does not exercise the plenary power of a state legislature. Without deciding that the acts of a municipal legislative body are entitled to the same deference accorded the enactments of a state legislature, analytically, these ordinances will be evaluated in a similar fashion.

[31] Several Second Circuit cases have also recognized an incidental burden on interstate commerce if a regulation has a disparate impact on nonlocal entities as compared to local entities. *See Town of Southold*, 477 F.3d at 50; *Freedom Holdings Inc.*, 357 F.3d at 218; *USA Recycling, Inc.*, 66 F.3d at 1287. Under the Supreme Court's dormant Commerce Clause jurisprudence, a disparate impact on out-of-state commerce will also constitute discrimination against interstate commerce, subject to stricter scrutiny than under the *Pike* analysis. *See Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994) ("As we use the term here, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."); *cf. Town of Southold*, 477 F.3d at 48 (noting that a statute may discriminate against interstate commerce in its effect).

third-party debt collectors or law firms to collect on New York City debts must obtain a DCA license and subject themselves to the DCA's regulatory authority, even if these contracts are formed entirely outside the state.  In so doing, Local Law 15 regulates wholly extraterritorial conduct.  This in itself is sufficient to meet plaintiffs' burden of demonstrating that the statute places some incidental burden on interstate commerce.  *See Town of Southold*, 477 F.3d at 50; *Automated Salvage Transp., Inc.* 155 F.3d at 77.[32]

Plaintiffs also argue that Local Law 15 places another incidental burden on interstate commerce that, at least at summary judgment, is sufficient to meet their burden.  As plaintiffs argue, when a debt buyer purchases a portfolio of loans from an originating creditor, the location of each debtor's residence may not be immediately evident.  Accordingly, under Local Law 15, a debt buyer operating on an interstate basis will have to scrutinize the loan pools it seeks to purchase in order to determine whether any of the debtors are located in New York City.  If so, and the debt buyer has not previously obtained a DCA license to collect on a New York City debt (or preemptively obtained a license in the jurisdiction), it will have to weigh the cost and time of doing so, as well as the ongoing burden of submitting to the DCA's regulatory authority, against the potential return on collecting on the debt.  If the debt buyer does decide to obtain a DCA license, it must gather the required information to answer the questions—some of which may be quite onerous[33]—on the license application, obtain the applicable business certificate,[34]

---

[32] While there is a question of fact as to whether DBA's contracts are, in fact, formed out of state, the relevant burden under *Pike* is that on interstate commerce as a whole, not the burdens on any one interstate firm.  *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978).  Therefore, there is no question of material fact as to the existence of incidental burden here due to Local Law 15's regulation of wholly extraterritorial commerce.

[33] As part of the application, a debt buyer must submit the following information (for the owner, if the debt buyer is a sole proprietorship; for all general partners, corporate officers, and shareholders owning 10% or more of the business applying for a license, if the debt buyer is a corporation or partnership; and for all members if the debt buyer is a limited liability company): (i) the name, social security number, address, and percent of company stock owned by these individuals; (ii) if any of these individuals (a) has previously been licensed by the DCA, (b) had a DCA license denied, suspended, or revoked, or (c) been an officer, director, shareholder, or partner of an entity

and submit the application.  Once the application is approved and the debt buyer receives the licensing document from the DCA, it may then seek to collect the debts that it has purchased (or will purchase).  All of these steps take time and resources, thereby impeding the ability of interstate debt buyers to access the New York City debt market on short notice, in a manner that may be qualitatively and quantitatively different than for debt buyers in New York City operating on a purely intrastate basis, which likely will not have to take the same steps before purchasing any given pool of loans.  *Cf. Tetra Techs., Inc. v. Harter*, 823 F. Supp. 1116, 1121 (S.D.N.Y. 1993) (finding that, if out-of-state contractors were forced to obtain a New York engineering license before operating in the state, there would be "an obvious adverse—and differentially adverse—effect" on them, as they "would not be able to enter the market on short notice").  To what extent this burden may impede interstate debt buyers more than debt buyers operating on an intrastate basis, and—critically—to what extent it will reduce the flow of interstate commerce, *see Automated Salvage Transp., Inc.* 155 F.3d at 77 (listing a reduction in "the flow of interstate commerce" as constituting an incidental burden on interstate commerce

---

licensed by the DCA, the name of the individual, the name and address of the licensed business, and the DCA license number; (iii) if any of these individuals (a) has ever been found guilty of a crime, offense, or violation, (b) has a criminal or civil charge pending against him, (c) has any DCA-issued Notice of Violation, Notice of Hearing, Summons, Padlock Order, or other order in effect or pending, (d) has had a court render a judgment against him or any business operated by him for activity related to the conduct of a business, or (e) has any judgment against him or any business operated by him that has not been paid in full for 30 days or more, a description of the relevant charge or offense, including, where relevant, the date of conviction, the nature of the incident, the persons involved, and the outcome.  *See* N.Y. City Department of Consumer Affairs, Basic License Application (July 28, 2010), *available at* http://www.nyc.gov/html/dca/downloads/pdf/apprem.pdf.

[34] Businesses incorporated outside of New York must obtain a "Certificate of Doing Business in Good Standing" from the Secretary of State in the state in which they are incorporated and file this Certificate with an application for "Authority to Conduct Business in New York" with the New York State Secretary of State.  *See* N.Y. City Department of Consumer Affairs, Business Toolbox, Apply for a License, http://www.nyc.gov/html/dca/html/licenses/122.shtml (last accessed May 26, 2012).  The Court takes judicial notice of this website and the DCA Basic License Application.  *See* Fed. R. Evid. 201(b) (allowing the Court to take judicial notice of facts "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also United States v. Akinrosotu*, 637 F.3d 165, 168 (2d Cir. 2011) (taking judicial notice of official state website).

under *Pike*), is not clear from the record before the Court.  But drawing all permissible factual inferences in favor of plaintiffs', as the Court must, the presence of this burden is sufficiently likely so as to survive defendants' motion for summary judgment.

*Benefits*

Defendants argue that any burden on interstate commerce is without a doubt clearly outweighed by Local Law 15's benefits to New York City.  In defendants' view, the ordinance is necessary to address abusive debt collection practices—particularly, the explosion in debt collection suits brought on behalf of debt buyers—against vulnerable debtors by subjecting debt buyers engaged in debt collection in New York City, as well as the attorneys and law firms that bring suits on their behalf, to the DCA's regulatory authority.  Even according the City Council's determination as to the benefits of Local Law 15 the deference it is due, the Court can hardly conclude that defendants are entitled to summary judgment.

Plaintiffs concede New York City's interest in regulating debt collection practices.  They contest, on the other hand, defendants' claim that debt buyers are responsible for any abusive debt collection practices against vulnerable debtors—or, indeed, that any such abuses occur, or that any debtors in New York City are, in fact, "vulnerable."  A thorough review of the record reveals no evidence to support plaintiffs' contention.  During the City Council hearings on Int. 660, in response to the Councilmembers' questions regarding the existence of abusive debt collection practices, representatives of the debt collection industry argued only that there is another side to this story: that debt avoidance is flourishing, that the number of consumer complaints regarding abusive practices is infinitesimal in comparison to the number of contacts debt collectors have with consumers, that plaintiffs' attorneys seize on these allegations of abusive collection practices to extort payments from creditors, and that debtors often

affirmatively decide not to contest debt collection lawsuits because they are aware that they owe their creditors, leading to default judgments.  Not only do these statements fail to address the existence of abusive debt collection practices, there is no evidence in the record to substantiate their veracity.  By contrast, there is considerable evidence in the record corroborating the existence of abusive debt collection practices, including the statistical evidence presented in the UJC Report and the testimony of multiple consumer protection and legal services organizations.  On this record, even drawing all permissible factual inferences in plaintiffs' favor, a reasonable fact-finder could not find that the abusive debt practices Local Law 15 is designed to curb do not exist.

At the same time, a reasonable factfinder might readily conclude that the purported benefits of Local Law 15 are entirely illusory.  To the extent that Local Law 15 is intended to address the same harassing practices—such as "threatening delinquent debtors, or calling such people at outrageous times of the night," N.Y. City Admin. Code § 20-488—that originally motivated the City to regulate debt collection, it is not at all obvious that extending DCA licensing requirements to debt buyers that do not directly contact debtors and attorneys regularly engaged in debt collection advances this purpose.  First, as previously discussed, *see* Section II.B, *supra*, New York City does not have the authority to regulate the practice of law.  *See* N.Y. Const. art IX, § 2(c) (allowing municipalities the power "to adopt and amend local laws," so long as "not inconsistent with the provisions of the constitution or not inconsistent with any general [i.e. state] law"); N.Y. Mun. Home Rule Law § 10(1) (same); N.Y. Jud. L. § 90 (giving the New York State courts the authority to regulate the practice of law and discipline attorneys for misconduct).  Thus, any attempt by the DCA to regulate attorneys' contacts with debtors on behalf of their clients is impermissible.  Second, debt collectors that contact debtors directly are

already prohibited from engaging in abusive practices by New York City, New York State, and the federal government. *See id.* §§ 20-493.1, 20-493.2 (prohibiting debt collectors from engaging in certain debt collection practices and requiring certain information to be provided to debtors); Rules of the City of New York, tit. 6, ch. 5 §§ 5-77, 5-78 (setting out rules governing communications with debtors and third-parties relating to collection of debts, including prohibitions on harassing or abusive communications, false or misleading representations, and unfair or unconscionable debt collection practices); N.Y. Gen. Bus. L. § 601 (prohibiting creditors and their agents from engaging in an enumerated set of practices, including communicating with the debtor or any member of the debtor's family or household in an abusive or harassing manner); 15 U.S.C. §§ 1692b-1692j (setting out rules governing communications with debtors and third-parties relating to collection of debts, including prohibitions on harassing, oppressive, or abusive conduct; false, deceptive, or misleading representations; and unfair or unconscionable debt collection practices). Given the extensive and overlapping regulations that apply to debt collectors that actually contact consumers, a reasonable fact-finder would be hard-pressed to conclude that extending the City's regulations to debt buyers that do not directly contact debtors would serve in any way to deter abusive communications.

In addition to prohibiting these harassing communications with debtors, Local Law 15's primary concern, as apparent from the record before the Court, is to address abuses in connection with and in the context of litigation pursued by attorneys and law firms on behalf of debt buyers. *See, e.g.*, Ciapetta Decl., Ex. H. at 4-5 (setting out the concerns leading to passage of Local Law 15). But Local Law 15's purported benefits in curbing such abusive litigation also appear entirely illusory. Again, New York City simply lacks the authority to regulate the practice of law. It also lacks the authority to regulate the rules of practice and procedure in the courts. To

the contrary, the Civil Court in New York City is part of New York State's Unified Court System.  *See* N.Y. Const. Art. VI § 1(a) (establishing unified court system for New York, including Court of Appeals, the Appellate Division, Supreme Court, and the New York City Civil Court); *see also* N.Y. City Civ. Ct. Act § 102 (establishing New York City Civil Court and providing that it shall be part of the State's united court system).  The power to regulate the courts' practice and procedure is vested with the State Legislature, in the first instance, *see* N.Y. Const. Art. VI § 30 (granting the Legislature "the same power to alter and regulate the jurisdiction and proceedings in law and in equity that it has heretofore exercised" and the authority to "delegate, in whole or in part, to a court, including the appellate division of the supreme court, or to the chief administrator of the courts, any power possessed by the legislature to regulate practice and procedure in the courts"), and with the courts, to the extent that this power has been delegated to them, *see* N.Y. Jud. L. § 211 (according Chief Judge of Court of Appeals the authority to promulgate, after consultation with the administrative board of the courts and with the approval of the Court of Appeals, standards and administrative policies relating to "[t]he adoption, amendment, recission and implementation of rules and orders regulating practice and procedure in the courts, subject to the reserved power of the legislature"); N.Y. City Civ. Ct. Act § 2103 (providing that the Appellate Division, First and Second Department, "shall jointly adopt rules to implement and facilitate procedure" in the New York City civil court, "consistent with standards and policies adopted by the administrative board").  Consequently, any steps that the DCA takes to impose restrictions on litigation brought on behalf of debt buyers will be invalid.  *See* N.Y. Mun. Home Rule Law § 11 (stating that municipalities "shall not be deemed authorized . . . to adopt a local law which supersedes a state statute, if such

local law . . . [a]pplies to or affects the courts as required or provided by article six of the constitution").

Pursuant to their authority to establish the rules governing practice and procedure, the Courts and the State Legislature have promulgated measures to address many of the concerns articulated as the rationale for Local Law 15, including lack of notice of lawsuits, *see, e.g.*, N.Y. C.P.L.R. §§ 305, 306, 308, 312(a) (setting out service requirements for New York courts, including proof of service); N.Y. City Civ. Ct. Act §§ 400, 401, 403, 409 (same for New York City Civil Court); N.Y. Ct. R. § 208.6 (setting out form of summonses for New York City Civil Court), unfair default judgments, *see, e.g.*, N.Y. C.P.L.R. § 3215 (setting out procedures and requirements to obtain default judgment in New York courts); N.Y. City Civ. Ct. Act § 1402 (same for New York City Civil Court); N.Y. C.P.L.R. § 317 (allowing defense of action following entry of judgment "upon a finding of the court that [defendant] did not personally receive notice of the summons in time to defend and has a meritorious defense"), and meritless litigation, *see, e.g.*, N.Y. Ct. R. § 130-1.1(a) (requiring all papers served on another party or submitted to court to be signed by attorney, certifying that to the best of attorney's knowledge, presentation of the paper and contentions therein are not frivolous); *id.* § 130-1.1 (providing for costs to be awarded for frivolous conduct), including litigation barred by the statute of limitations, *see, e.g.*, N.Y. Gen. Bus. Law § 601 (prohibiting attempts to enforce legal rights against creditors if such rights do not exist).[35]  Indeed, several of these rules provide additional safeguards for actions arising out of consumer-credit transactions.  *See, e.g.*, N.Y. C.P.L.R. § 305 (setting out formatting requirements for litigation arising out of consumer-credit transactions to

---

[35] Attempting to pursue time-barred litigation to collect on debts is also already prohibited by the federal government.  *See* 15 U.S.C. § 1692(e) (prohibiting debt collectors from threatening to take any action that cannot legally be taken); *id.* § 1692(f)(1) (prohibiting the collection of any debt unless permitted by law).

help curb litigation abuses); N.Y. City Civ. Ct. Act § 401(d) (requiring summons for consumer credit actions to be provided in Spanish and English); N.Y. Ct. R. § 208.6(d), (f)-(h) (requiring special summons in actions arising from consumer-credit transactions).  Moreover, the record before the Court suggests that the courts, working with legal services and consumer protection organizations, are continuing to develop methods to deter abuses and protect defendants in these actions. *See, e.g.*, Ciappetta Aff. Ex. E 104 (describing Office of Court Administration initiative to improve service on defendants).  If these measures remain inadequate to address abusive litigation brought on behalf of debt buyers, the responsibility to take further ameliorative action rests with the New York courts and the New York State Legislature.  It simply does not lie within the power of the DCA or New York City to do so.

In sum, drawing all permissible factual inferences in plaintiffs' favor, as the Court is obliged to do in examining defendants' motion for summary judgment, the benefits that have been ascribed to Local Law 15 do not clearly outweigh its burdens on interstate commerce.  For this reason, defendants' motion as to plaintiffs' *Pike* claim must be denied.

### b.  Plaintiffs' motion

Notwithstanding the apparent illusoriness of the benefits claimed for Local Law 15, plaintiffs' motion for summary judgment also must be denied.  Defendants have asserted that, even though debt buyers do not directly contact consumers, subjecting debt buyers to DCA licensing and regulations will still help curb abusive communications initiated by third-party debt collectors acting on their behalf.  Nothing prohibits New York City from adopting a "belt-and-suspenders" approach to regulation.  *Cf. McEvoy v. IEI Barge Servs.*, 622 F.3d 671, 677 (7th Cir. 2010) (noting that "Congress may choose a belt-and-suspenders approach to promote its policy objectives"); *McNelius Truck & Mfg., Inc. v. Ohio ex rel Montgomery*, 226 F.3d 429, 440 (6th

Cir. 2000) (upholding State's "belt-and-suspenders approach to regulation").   The Court is skeptical—to say the least—that, at trial, the benefits of adopting a belt-and-suspenders approach here, at increased cost to the regulated community, will be found to substantially outweigh the burdens to interstate commerce.   But drawing all permissible factual inferences in defendants' favor, as it must in examining plaintiffs' motion for summary judgment, the Court is reluctant to award plaintiffs judgment at this stage in the proceedings—especially given the considerable deference due the City Council's evaluation of the benefits of the challenged legislation, *see Jorling*, 16 F.3d at 1308, and the Supreme Court's caution that courts should be "particularly hesitant to interfere" with a legislative body's regulatory efforts where the subject of regulation is "typically and traditionally a function of local government exercising its police power," *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 344 (2007). The weighing of Local Law 15's benefits and burdens pursuant to *Pike* should instead be left to the finder of fact at trial, following a more complete development of the factual record.

For this reason, plaintiffs' motion is denied.

**D.  *Contract Clause Challenge***

Plaintiffs next argue that Local Law 15 violates the Contract Clause because it impairs contracts between (a) DBA and third-party debt collectors and law firms, (b) DBA and debtors, and (c) DBA and originating creditors.   Because plaintiffs' allegations do not state a viable claim under the Contract Clause, the Court grants defendants' motion for summary judgment.

Article I, Section 10, Clause 1 of the United States Constitution declares that "[n]o State shall . . . pass any . . . Law . . . impairing the Obligation of Contracts."   This facially absolute prohibition is "not to be read with literal exactness like a mathematical formula," however. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934).   Rather, the Supreme Court

has long held that "literalism in the construction of the [C]ontract [C]lause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection." *W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 433 (1934).  Thus, "[a] state may take necessary measures in pursuit of legitimate state goals without bar by the [C]ontract [C]lause even though some contract rights may to some degree be modified or affected."  *Kirshner v. United States*, 603 F.2d 234, 239 (2d Cir. 1978).  Because the Contract Clause must be "harmonize[d] . . . with a state's police power to protect its citizens," *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 52 (2d Cir. 1998), it must be viewed as imposing only "*some* limits upon the power of a State to abridge existing contractual relationships," *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978).

In this vein, the Contract Clause is implicated only when a law "impairs" a contractual "obligation," not when it merely impacts the contract in an incidental manner.  *See Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) (noting that the Contract Clause is violated when the law is "limited in effect to contractual obligations or remedies").  "Obligation" in this sense refers to a specific promise to perform or forego some action under the contract, not to the general benefit that the contracting parties contemplate by entering the agreement.  "Impairment" occurs when the law prohibits performance of an obligation and extinguishes available remedies for non-performance.  *See Blaisdell*, 290 U.S. at 431 ("The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them."); *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251 (7th Cir. 1996) ("[T]he obligation created by a contract is an obligation to perform or pay damages for nonperformance . . . and if the second alternative remains, then, since it is an alternative, the obligation created by the contract is not impaired.") (internal citation omitted); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 64 F. Supp. 2d 537, 546

67

(E.D. Va. 1999) (noting that a contract is impaired "for the purposes of the Contract Clause when a law 'materially changes [a contract's] binding force,' or 'deprive[s] the holder of the contract all adequate and efficacious remedy.'") (quoting *Nelson v. Police Jury of the Parish of St. Martin*, 111 U.S. 716, 721 (1884)).[36]

In analyzing a claim under the Contract Clause, the court considers three questions: "(1) whether [any] contractual impairment is . . . substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a general social or economic problem; and, if such a public purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and appropriate." *Sanitation & Recycling Indus. v. City of N.Y.*, 107 F.3d 985, 993 (2d Cir. 1997). The first question—whether the state law has operated as a substantial impairment of a contractual relationship—is a threshold inquiry that, in turn, requires the court to consider three additional sub-questions: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). Here, Local Law 15 does not impair any contractual relationship. Consequently, the Court need not address any of the remaining questions in the analysis.

Plaintiffs allege that three contractual relationships are impaired by Local Law 15: that

---

[36] The Contract Clause thus protects different interests than those safeguarded by the dormant Commerce Clause. Whereas the Contract Clause is implicated in a narrow subset of situations where a law impairs an obligation created by an individual contract, *see Antoni v. Greenhow*, 107 U.S. 769, 795 (1883) (noting that the Contract Clause "prohibits legislation . . . affecting contracts between the State and individuals . . . [and] contracts between individuals"), the dormant Commerce Clause is implicated when a law discriminates against or impermissibly burdens interstate commerce; in other words, its impact on any individual is not germane to the inquiry, *see Exxon Corp.*, 437 U.S. at 126 ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 96 (2d Cir. 2009) (stating that a dormant Commerce Clause claim is not judged by "the extent of its impact on an individual plaintiff" but by "its overall economic impact on *interstate commerce* in relation to the putative local benefits conferred"). A law, therefore, may be permissible under the Contract Clause but nonetheless run afoul of the dormant Commerce Clause.

between (a) DBA and third-party debt collectors and law firms, (b) DBA and debtors, and (c) DBA and originating creditors.   In plaintiffs' view, DBA's contracts with third-party debt collectors and law firms are impaired because Local Law 15 requires DBA to obtain a license before entering into these contracts.   Similarly, plaintiffs argue, DCA licensing and regulatory requirements impair DBA's contracts with debtors because the requirements must be satisfied before DBA may engage in debt collection.   Finally, plaintiffs allege that Local Law 15 impairs DBA's contracts with originating creditors because it prevents DBA from stepping into the originators' shoes.   Specifically, plaintiffs submit that, when an originating creditor assigns its right to a debt to a debt buyer like DBA, it intends to assign an unencumbered right, meaning that the debt buyer's rights and obligations mirror that of the creditor's.   Local Law 15, however, imposes additional requirements on the debt buyer that are not imposed on the original creditor.[37] In this respect—according to plaintiffs—Local Law 15 undermines the parties' understanding at the time of contract formation, and, consequently, impairs the contractual agreements.

Plaintiffs do not—as they must, even at this stage—identify any specific contractual obligations or point to specific contracts that are purportedly impaired by Local Law 15. Assuming *arguendo* the existence of such contracts, plaintiffs still fail to state a viable Contract Clause claim, as none of the burdens plaintiffs allege constitutes an unconstitutional impairment of a contractual obligation.   The crux of plaintiffs' allegations is that Local Law 15 imposes additional burdens that make performance of the contracts more onerous, and the contracts

---

[37] Plaintiffs are correct in this regard.  As amended, § 20-489 excludes from the definition of debt collection agency:

> (7) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow agreement; (ii) *concerns a debt which was originated by such person*; (iii) concerns a debt which was not in default at the time it was obtained by such person as a secured party in a commercial credit transaction involving the creditor . . . .

N.Y. City Admin. Code. § 20-489 (2009) (emphasis added).

potentially less desirable and profitable as a result.  While this may be the case, the law in no way prevents performance of a contractual obligation or extinguishes the parties' available remedies for nonperformance; rather, the parties still may perform and enforce the bargained-for terms of the contracts.  *See Blaisdell*, 290 U.S. at 431; *Horwitz-Matthews, Inc.*, 78 F.3d at 1251; *Waste Mgmt. Holdings, Inc.*, 64 F. Supp. 2d at 545.  Undoubtedly, by imposing additional licensing and regulatory requirements that must be satisfied for the benefit of the contracts to be realized, Local Law 15 has some impact on the parties' contractual expectations.  But this incidental impact does not implicate the Contract Clause.

Under plaintiffs' reasoning, any legislation that affected the manner of performance of a private contract or impacted the contract's value could be challenged under the Contract Clause.  If this were the case, parties could insulate themselves entirely from any future regulation merely by entering into a private contract.  This is clearly not the law.  *See Stoneridge Apts., Co. v. Lindsay*, 303 F. Supp. 677, 679 (S.D.N.Y. 1969) (noting that the Contract Clause is "intended to protect benefits and rights of a party under a contract and not to interfere with legislation which merely relates to the subject matter of the contract").  Parties enter into contracts with the understanding and expectation that states or municipalities may enact legislation affecting their subject matter.  Accordingly, in the words of Justice Holmes more than a century ago, "'[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.'"  *Exxon Corp.*, 462 U.S. at 190 (quoting *Hudson Co. v. McCarter*, 209 U.S. 349, 357 (1908)).  The Contract Clause does not contemplate this stymieing of governmental regulatory power.  *See Exxon Corp.*, 462 U.S. at 190 ("The Contract Clause does not deprive the States of their 'broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a

70

result.'") (citing *United States Trust Co.*, 431 U.S. at 22).

Because Local Law 15 does no more than incidentally affect DBA's contractual agreements, without in any way preventing the performance of a contractual obligation or extinguishing available remedies for non-performance, plaintiffs fail to state a cognizable claim under the Contract Clause. Defendants' motion for summary judgment as to this claim accordingly is granted.

### E. *Vagueness Challenge*

Finally, plaintiffs claim that Local Law 15 is unconstitutionally vague under the Due Process Clause, both on its face and as applied to them. From their perspective, the amendments it enacted to the definition of "debt collection agency"—to include debt buyers that seek to collect debts using "legal processes *or other means*," as well as attorneys or law firms that "*regularly engage*[] in activities *traditionally performed* by debt collectors," but not attorneys or law firms collecting a debt on behalf of a client "solely through *activities that may only be performed by a licensed attorney*," N.Y. City Admin. Code § 20-489 (emphasis added)—do not give "a person of ordinary intelligence a reasonable opportunity" to understand what conduct is being regulated. *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (setting out standard for vagueness challenges under Due Process Clause) (internal citations and quotation marks omitted). As discussed above, to the extent that Local Law 15 purports to regulate attorney conduct, it is inconsistent with state law, and is therefore invalid. Consequently, it is unnecessary for the Court to address plaintiffs' vagueness claim insofar as it relates to the regulation of attorneys or law firms. This leaves only plaintiffs' claim that the amended definition of debt collection agency to include a debt buyer that "seeks to collect [a] debt . . . by, including but not limited to, initiating or using legal processes *or other means*" is

unconstitutionally vague on its face and as applied to DBA.  The Court finds this argument to be without merit.

To begin, it is doubtful that plaintiffs have standing to assert either their facial or as-applied claim.  "Courts generally disfavor facial vagueness challenges outside the context of the First Amendment."  *Genco Importing, Inc. v. City of N.Y.*, 552 F. Supp. 2d 371, 384 (S.D.N.Y. 2008); *accord Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006); *see also Dickerson*, 604 F.3d at 741-42 (setting out reasons that facial vagueness challenges are generally disfavored).  Indeed, the Second Circuit has acknowledged that the question of whether facial void-for-vagueness challenges are permissible at all when a challenge is not based on the First Amendment is "unsettled."  *Id.* at 743.  To the extent that such challenges are allowed, the Circuit has suggested that they may be presented only when "no set of circumstances exists under which the law would be valid," or when the challenge is "in the presence of a constitutionally-protected right."  *Id.* at 743-44 (citing, *inter alia*, *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (Stevens, J., plurality opinion); *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (internal quotation marks omitted).  Plaintiffs cannot demonstrate that there is no set of circumstances under which the law would be valid; indeed, as discussed in greater detail below, the law is valid as applied to DBA. Nor have plaintiffs presented a case—nor is the Court aware of one—where a court in this Circuit has entertained a facial void-for-vagueness challenge to a statute that addresses purely commercial concerns and does not implicate the First Amendment or levy criminal sanctions against violators.  Nothing about Local Law 15 justifies a departure from this precedent.

For plaintiffs to have standing to bring their as-applied claim, the law must be unconstitutionally vague as applied to DBA.  *See L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999) ("[A] person to whom a statute may constitutionally be applied

may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court.") (internal quotation marks omitted).  Plaintiffs contend that the "other means" formulation provides no guidance as to what activities may subject them to the DCA's licensing requirements and regulations.  But they need not look to this language for guidance.  As they repeatedly assert, DBA regularly engages with law firms to collect on consumer debts on its behalf, including by initiating suit against debtors.  In other words, DBA's normal course of business involves "seek[ing] to collect [a] debt . . . through the services of another by . . . initiating or using legal processes," N.Y. City Admin. Code § 20-489, thereby clearly falling under the ambit of the code provision.

Even if plaintiffs have standing to bring their vagueness claim, their argument is without merit.  Plaintiffs' main contention appears to be that the phrase "other means" provides no guidance as to whether the mere act of entering into a contract with a third-party debt collector may constitute an attempt to collect a debt, and therefore require that the contracting party obtain a debt collection license.  But this language does not exist in isolation; rather, "other means" is part of a non-exhaustive list providing definition to the phrase "seeks to collect."  As discussed above, the other entries in the list—"initiating" and "using" legal processes—contemplate actions beyond simply hiring an attorney.[38]  Accordingly, plaintiffs' concerns notwithstanding, the phrase "other means" should also be construed as requiring something more than simply hiring a third-party debt collector. *See Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 8 (1985) ("[I]t is a familiar principle of statutory construction that words grouped in a list should be given related meaning.") (internal quotation marks omitted); *accord Caputo v. Pfizer, Inc.*, 267 F.3d

---

[38] In the same way, a plain reading of the phrase "seeks to collect" suggests an affirmative step beyond entering into a contractual arrangement. *Cf.* Merriam-Webster's Collegiate Dictionary 1285 (11th ed. 2008) (defining "to seek" as, *inter alia*, "to go in search of : look for," "to ask for," "to try to acquire or gain," or "to make an attempt").

181, 189 (2d Cir. 2001). The exact parameters of the affirmative steps that would trigger the licensing requirement are not explicitly demarcated by the law. But the fact that some such step is required provides sufficient clarity to satisfy the relaxed standard under which this Court assesses economic regulations like Local Law 15. *See VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) ("The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all.") (internal quotation marks omitted).[39]

### III.     CONCLUSION

For all the reasons discussed above, plaintiffs' motion is GRANTED in part and DENIED in part, as is defendants'. On plaintiffs' claims that New York State has preempted the entire field of debt collection regulation; that Local Law 15 is inconsistent with §§ 600, 601, and 602 of the New York General Business Law; that Local Law 15 violates the Contract Clause; and that Local Law 15's phrase "using legal processes or other means" is unconstitutionally vague, the Court grants summary judgment to defendants and denies summary judgment to plaintiffs. On plaintiffs' claim that Local Law 15 is inconsistent with §§ 53 and 90 of the New York Judiciary Law, the Court grants summary judgment to plaintiffs and denies summary judgment to defendants: the ordinance, along with its accompanying regulations, are without force and effect as applied to Berman P.C. and Katzen LLP.

Finally, on plaintiffs' claims that Local Law 15 violates the Commerce Clause by

---

[39] Plaintiffs argue that stricter scrutiny should apply because Local Law 15 threatens to inhibit the exercise of constitutionally protected rights; namely, the right to contract and the right to engage in interstate commerce. Even were the Court to accept plaintiffs' argument, the statutory language would likely survive heightened scrutiny. The Court, however, declines to adopt this view, which would eviscerate the "relaxed" vagueness test for economic regulations.

regulating commerce that is wholly extraterritorial to New York State and by imposing burdens

on interstate commerce that clearly outweigh the ordinance's putative local benefits, the Court

denies summary judgment to both plaintiffs and defendants.  Genuine questions of material fact

remain, on plaintiffs' extraterritoriality claim, as to whether DBA's contracts with third-party

debt collectors and law firms are indeed formed entirely outside of New York and, on plaintiffs'

*Pike* claim, as to (a) the nature of any incidental burdens Local Law 15 places on interstate

commerce, (b) the nature of any benefits advanced by Local Law 15, and (c) whether any such

burdens clearly outweigh any such benefits.  The parties are directed to contact United States

Magistrate Judge Pollak on or before October 31, 2012 to arrange for a pretrial conference

leading to the prompt submission of a final joint pretrial order in preparation for trial on these

unresolved discrete issues.

    **SO ORDERED.**

Dated: Brooklyn, New York
      September 29, 2012

                                      s/ENV

                                      ERIC N. VITALIANO
                                      United States District Judge